UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

|                              |                        |
|------------------------------|------------------------|
| UNITED STATES OF AMERICA,    |                        |
|            Plaintiff,        | Case No. 97-CR-98-JPS  |
| v.                           |                        |
| RANDY M. YAGER,              |                        |
|            Defendant.        | ORDER                  |

On May 30, 1997, a grand jury indicted the defendant, Randy M. Yager ("Yager"), and sixteen co-defendants with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1962(c), 2) and conspiracy to commit RICO violations (18 U.S.C. §§ 1962(d), 2). (*See generally* Docket #1). Yager's indictment stemmed from his alleged connection with a vast criminal network of motorcycle clubs, known collectively as The American Outlaw Association, or the "Outlaws." (Docket #1 at 2). After absconding for over seventeen years as a fugitive, Yager was arrested in Baja, Mexico, on October 26, 2014. (Docket #2099 at 2). On March 28, 2016, Yager will stand trial for these charges. (Docket #2110).

In anticipation of that trial, Yager filed four evidentiary motions. Currently before the Court are: (1) a motion to suppress evidence obtained during a traffic stop on September 25, 1994, in Silver Lake, New York (Docket #2091); (2) a motion for production and *in camera* review of certain presentence reports (Docket #2094); (3) a motion to compel information related to the government's witnesses (Docket #2093); and (4) a motion for a pretrial ruling on the admissibility of co-conspirator statements (Docket #2095). For the reasons stated below, the Court will require an evidentiary hearing on the issue of probable cause to conduct the traffic stop. In addition,

the Court will deny the remaining motions without prejudice, with the understanding that the parties may properly raise any remaining issues related thereto as they arise during pretrial discovery or at trial.

1.   MOTION TO SUPPRESS

On September 25, 1994, a brutal motorcycle club brawl broke out at the Lancaster Speedway in Lancaster, New York, between the Outlaws and their rivals, the Hells Angels. (Docket #2092 ¶¶ 1-3). Two people were killed; many more were injured. (Docket #2099 at 3).

Within an hour of the violent fight, the police conducted a traffic stop of a vehicle that Yager was driving. (Docket #2099 at 4; Docket #2092 ¶¶ 1-3). After the stop, the police searched Yager's car and recovered, among other things, a vest stained with blood from one of the speedway murder victims. (Docket #2099 at 5).

An important issue before the Court is whether Trooper John Morrow ("Morrow") of the New York State Police had sufficient probable cause to stop Yager's vehicle. This question in turn rests on disputed facts, and the Court, therefore, will require an evidentiary hearing to resolve it.

On the one hand, the parties do not dispute that Morrow was on duty the morning of September 25, 1994, in the town of Brant, New York. (Docket #2092 ¶ 1). Brant is approximately fifty miles southwest of the Lancaster Speedway. (Docket #2092 ¶ 2). Following the speedway brawl, radio transmissions describing the incident were broadcast to area police. (Docket #2092 ¶ 2). The transmissions stated that many participants were leaving the speedway, and that officers should pay attention to potential witnesses departing the area, especially those in cars bearing out-of-state, Midwestern license plates. (Docket #2092 ¶ 3). Upon learning this, Morrow parked on

State Route 20, where he noticed a 1975 Oldsmobile with Illinois license plates traveling westbound. (Docket #2092 ¶ 6). After following the car for six miles, Morrow stopped the vehicle in the Village of Silver Lake. (Docket #2099 at 4).

The precise location of this stop is the center of the parties' dispute. Importantly, State Route 20, the road on which Morrow spotted and subsequently followed Yager, forks into two separate roads in Silver Lake. (Docket #2091 at 3-4). One road veers to the right and is known as Truck Route 20 or Howard Street (hereinafter "Howard"). (Docket #2091 at 3-4). The other road continues straight forward and is known as State Route 20 or Central Avenue (hereinafter "Central"). (Docket #2091 at 3-4). According to the government, Morrow stopped the vehicle because Yager failed to use a proper turn signal as he veered right from State Route 20 onto Howard. (Docket #2099 at 4-5). In contrast, Yager argues that, according to Officer Heavern, the police officer who provided back-up to Morrow during the incident, the stop was made on Central. (Docket #2091 at 6).

It is the defendant's burden to establish the necessity of an evidentiary hearing on a suppression motion. *United States v. Walker*, 237 F.3d 845, 850 (7th Cir. 2001). That burden can only be met if the defendant puts forth allegations and moving papers of sufficiently "definite, specific, detailed, and nonconjectural" nature showing that there is a disputed issue of material fact that will affect the outcome of the motion. *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir.2007).

The Court finds that the location of the car stop is a material dispute of fact, because it affects the determination of whether Morrow had probable cause to conduct a traffic stop. If the government is correct, Morrow may

have harbored a reasonable belief that Yager failed to use a required turn signal when veering right from State Route 20 onto Howard. On the other hand, if Yager continued straight forward from State Route 20 onto Central, there would have been no occasion for Yager to use his turn signal, thereby undermining the government's probable cause argument.

For these reasons, the Court will convene an evidentiary hearing to discuss whether probable cause existed for the traffic stop made by Morrow on September 25, 1994. The hearing will take place on December 23, 2015, at 10:30 a.m.

The Court notes that it does not find any material dispute relating to the facts that occurred after the stop. According to the government, once Morrow began speaking with Yager, he spotted a can of mace inside the vehicle. (Docket #2099 at 5). Once Morrow saw the alleged mace, he asked Yager where he was coming from, and Yager replied that he was going home from the Lancaster Speedway. (Docket #2099 at 5). In light of these two facts, Morrow removed Yager and the other occupants from the car and began a search for contraband. (Docket #2099 at 5). During the search, Morrow recovered a stained Hell's Angels vest, which was later discovered to have blood strains from a man who was killed during the speedway fight. (Docket #2099 at 5).

"During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). "Probable cause [to search] requires only a substantial chance of criminal activity, not an actual showing of such activity." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 244 (1983)). Though

warrantless searches are per se unreasonable under the Fourth Amendment, the automobile exception allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband. *See United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Carroll v. United States*, 267 U.S. 132, 153–56 (1925)). "When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (internal citations omitted).

Once Morrow spotted the can of mace in Yager's car and learned that Yager was returning from the Landcaster Speedway, he had probable cause to search the vehicle. *Schaafsma*, 318 F.2d at 722. Morrow knew that there had just been a bloody brawl at the speedway and that witnesses were leaving in vehicles bearing out-of-town, Midwestern licenses plates, such as Yager's. (Docket #2099 at 3-4). Moreover, Yager does not put forth any "definite, specific, detailed, and nonconjectural" showing that there is a disputed material issue related to Morrow's sighting of the mace. *Randle*, 966 F.2d at 1212. Mace was an illegal substance under New York law at that time (*See* N.Y. Penal Law § 270.05 (McKinney's, Westlaw through 2015)),[1] and as such, Morrow had more than sufficient grounds to question Yager about the mace and his recent whereabouts. *See Horton v. California*, 496 U.S. 128, 142 (1990).

---

[1] It was not until 1996 that the New York Legislature amended the statute to make the sale and possession of self-defense sprays, such as "Chemical Mace," lawful under certain circumstances. *See* Self Defense Spray Devices—Regulation of Possession, Sale and Use, 1996 Sess. Law News of N.Y. Ch. 354 (S. 1728–A) (McKinney's).

In addition, after Morrow confirmed Yager's presence at the fight, he harbored a reasonable belief that there was a "substantial chance" that Yager was involved with criminal activity. These facts in turn entitled Morrow to search Yager's vehicle for contraband under the automobile exception to the warrant requirement. *See Carroll*, 267 U.S. at 153-56. As such, no evidentiary hearing will be necessary on the issue of Morrow's probable cause to search Yager's car on September 25, 1994.

2.   PRESENTENCE REPORTS

Next, Yager moved the Court to compel production and conduct an *in camera* review of four presentence reports ("PSRs"). (*See generally* Docket #2094). The PSRs that Yager requests the Court review are those of David Wolf, Ronald A. Talmadge, Carl J. Warnecke, and Edward J. Anastas. (Docket #2094 at 1). Three of these defendants pled guilty in separate cases involving criminal activity associated with motorcycle clubs. (Docket #2100 at 3). The fourth is a co-defendant charged with Yager who was convicted in March of 2000. (Docket #2100 at 3). Yager believes these PSRs contain:

1.   Exculpatory material under *Brady v. Maryland*, 37 U.S. 83 (1963);

2.   Statements about the offenses alleged against Yager, and about the role of these witnesses in their own offenses of conviction;

3.   Inconsistencies with the witnesses' prior statements;

4.   Information about past drug use;

5.   Criminal history and conviction records;

6.   Information related to mental health conditions; and

7.   Information about the witnesses' cooperation with the government.

*(*Docket #2094 at 1-3). Yager claims that he is entitled to this information under the Fifth and Sixth Amendments of the Constitution. (Docket #2094 at 1).

In light of their confidential nature, it is "critical[ly] importan[t]…[to] maintain[] the confidentiality of presentence reports." *United States v. McGee*, 408 F.3d 966, 973 (7th Cir. 2005) (citing *States v. Cyphers*, 553 F.2d 1064, 1069 (7th Cir. 1977)). "Nevertheless, there may be some circumstances wherein disclosure of a presentence report may be absolutely essential to effective presentation of a defense and therefore required in the interests of justice." *United States v. Cyphers*, 553 F.2d 1064, 1069 (7th Cir. 1977). The Seventh Circuit has appropriately cautioned that enforcing the prosecution's *Brady* obligations with a "due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court." *United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992).

The Court is authorized to conduct an *in camera* review of a non-party witness's PSR to determine if it contains: (1) exculpatory information that "must be disclosed;" or (2) impeachment material that has a "reasonable likelihood [of] affect[ing] the trier of fact." *United States v. Anderson*, 724 F.2d 596, 598 (7th Cir. 1984). However, such an authorization is not a mandate, because it would be "simply asking too much of district court judges to require that they review the presentence reports of all witnesses when there is no particular indication that the reports contain *Brady* material." *United States v. Mitchell*, 178 F.3d 904, 907 (7th Cir. 1999); *see also United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992) (finding that a district court was not required to conduct an *in camera* review of certain FBI reports because:

(1) the defendant merely speculated that the reports contained *Brady* material; and (2) the government claimed that it had turned over all *Brady* material). As it relates to impeachment information, "[w]hether there is such a likelihood [to impeach] depends upon a number of factors such as the importance of the witness to the government's case, the extent to which the witness has already been impeached, and the significance of the new impeaching material on the witness' credibility." *Id.* (internal citations omitted).

In light of the Seventh Circuit's preference to maintain the confidentiality of PSRs, the Court will deny Yager's motion without prejudice. As in *Morris*, 957 F.2d at 1402, the government states that all four of the PSRs that Yager requests do not contain exculpatory information. (Docket #2100 at 6). Moreover, Yager does not present anything beyond mere speculation that the reports will contain *Brady* material. (*See generally* Docket #2094). Based on the fact that these witnesses were involved in similar crimes involving the Outlaws, Yager assumes that the PSRs will contain exculpatory information which has not already been produced. However, the government, adhering to its open-file policy, has provided Yager with "more discovery materials than the defendant would be entitled to obtain under strict adherence to the federal rules." *Mitchell*, 178 F.3d at 908.

With regard to the PSRs' impeachment value, the government expressly states that none of these witnesses will be critical to its case. (Docket #2100 at 6). Most, if not all, of the impeachment value in the PSRs, along with any information related to drug and/or alcohol use by the witnesses, are available from other sources, such as the discovery documents already provided to Yager, public records, and prior trial transcripts. (Docket

#2100 at 7-8). These discovery documents and other law enforcement materials are likewise the best source of prior criminal histories.[2] Should any criminal history information which has not already been given to Yager come to light, the government represents that it will provide it to Yager before trial. (Docket #2100 at 8).

Moreover, the "version of the offense" in a PSR is not a "statement" of the defendant within the meaning of the Jencks Act (18 U.S.C. § 3500(b)). *See United States v. McGee*, 408 F.3d 966, 974 (7th Cir. 2005). This rule recognizes the reality that PSRs are prepared by probation officers primarily to aid district courts at sentencing. *Id.* And, the adopting of the government's version of the offense is usually the result of the defendant's failure to submit his/her own version or object to the government's version. *Id.* at 973. In light of this reality, Yager's attempt to mine for impeachment material within that portion of the PSRs would be futile. The government also represents that most, if not all, of the version of the offense contained in these PSRs was a verbatim summary that appeared in multiple defendants' reports. Thus, the likelihood that each defendant, including the four in question now, would have been involved in creating or approving that language is highly unlikely. The discovery provided by the government during the course of this case as a result of its open-file policy, including interviews, grand jury, and jury trial testimony, is more than sufficient to provide Yager with witness statements from which he can cull potential inconsistencies.

Regarding potential witness-government cooperation information, the government highlights that the witnesses in question benefitted from their

---

[2]What is more, to the extent a prior conviction would be too old to find within existing law enforcement networks, it would likely be unavailable for use under Fed. R. Civ. P. 609(b).

bargains many years ago. (Docket #2100 at 9). As such, any potential bias on that ground is merely conjectural and unfounded.³ However, if Yager decides to cross examine the witnesses on these agreements, the government states that it will provide the relevant plea agreements, 5K1.1 and Rule 35 sentencing motions, and amended judgments. (Docket #2100 at 9).

Lastly, Yager suggests no reason to believe that the PSRs have any information related to the witnesses' mental health. The government represents that the PSRs indeed have none. (Docket #2100 at 8).

In sum, Yager's argument in support of the PSRs' disclosure assumes two critical facts: (1) that the information Yager seeks has not been already turned over by the government; (2) that the information is not already available in other, alternate sources, such as public records or prior trial testimony; and (3) that the information would ultimately be relevant to Yager's case or evidentiary positions. But, the record supports opposite conclusions, which ultimately obviate the need for the Court to order disclosure or an *in camera* review of the reports at least at this juncture. As such, the Court finds that the PSRs would only provide cumulative and non-essential material, and that disclosure of them is unnecessary at this time. Thus, the motion will be denied without prejudice.

3.  INFORMATION REGARDING COOPERATING WITNESSES

Yager moves to compel production of information related to the government's cooperating witnesses. (*See generally* Docket #2093). Yager claims he is entitled to this information under the Fifth and Sixth Amendments. (Docket #2093 at 1).

---

³These witnesses pled guilty and/or were tried approximately fifteen years ago. (See Docket #2100 at 8 n.2).

First, Yager specifically seeks the addresses of six government witnesses. (Docket #2093 at 3). In support, Yager cites to *Smith v. Illinois*, 390 U.S. 129, 131 (1968), which recognized that a witness's address can serve an important investigatory function. (Docket #2093 at 3). Without these addresses, Yager claims that he will be deprived of the opportunity to interview the government's witnesses, investigate their activities, and to obtain their background information. (Docket #2093 at 3). In response, the government maintains that its withholding of certain addresses is grounded in legitimate concerns about club violence and the witnesses' welfare. (Docket #2100 at 10-11). Moreover, the government argues that subsequent cases, both from the Supreme Court and the Seventh Circuit, have clarified that *Smith* did not establish a per se rule that defendants are entitled to all of a witness's personal information. *See e.g.*, *United States v. Edwards*, 47 F.3d 841 (7th Cir. 1995). As such, according to the government, the addresses should not be disclosed. (Docket #2100 at 10-11).

"It is well-settled that the Constitution does not require pretrial disclosure of prosecution witnesses." *United States v. Edwards*, 47 F.3d 841, 843 (7th Cir. 1995*)* (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). However, in *Smith*, the Court found that the government's failure to provide the defense with the identity and address of its principle witness violated the defendant's confrontation rights under the Sixth Amendment. 390 U.S. at 131. Despite the tension between these rules, cases have clarified that *Smith* applies "only where the lack of a witness's name and address denies a defendant an opportunity to effectively cross examine a witness." *United States v. Teller,* 412 F.2d 374, 380 (7th Cir. 1969). Ultimately, courts recognize that "the decision to disclose a witness' address or place of employment

Case 2:97-cr-00098-JPS   Filed 11/02/15   Page 11 of 15   Document 2118

cannot be made in a vacuum," such as when "a witness' life may be in jeopardy if he testifies." *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). The Seventh Circuit has thus instructed that "where there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address, and place of employment is not absolute." *Id.; cf. United States v. Higgs*, 713 F.2d 39 (3d Cir. 1983), *cert. denied*, 464 U.S. 1048, (1984) (finding that "it was an abuse of discretion for the trial court to order disclosure" of the witnesses' names and addresses in light of "specific corroborated evidence of threats"). It is the government's burden to prove that a threat to its witness is actual and not merely conjectural. *Id.*

The Court finds that the government has met its burden to show that safety concerns preclude the disclosure of its witnesses' addresses. During the course of the investigations and trials for other members of the Outlaws, it has become plain that the club is a violent, dangerous, and vengeful organization. (Docket #2100 at 11). Members who cooperate with the government are deemed "snitches," and are sometimes killed. (Docket #2100 at 11). The club, in other words, embodies its mottos that "God Forgives, Outlaws Don't" and that "Snitches are a Dying Breed." (Docket #2100 at 11). Moreover, the Outlaws' pattern of territorial violence motivated the government to place many witnesses involved in prior trials in the United States Marshal Service Witness Protection program. (Docket #2100 at 11). Many have since been relocated and provided with new identities. (Docket #2100 at 11). As in *Edwards*, where the court did not require the government to disclose certain witnesses' addresses, the witnesses in Yager's case face realistic fears of dangerous retaliation. *See also Edwards*, 47 F.3d at 843-44. Also, like the drug violence described in *Edwards*, members of the Outlaws

are still at large, thus making the threat of harm all the more legitimate and substantial. *Id.* In sum, the risk of disclosing the witnesses' addresses poses a real and actual threat to their safety and, as such, Yager's motion will be denied unless and until the potential threat to these witnesses' lives changes.

In addition, Yager requests an extensive amount of information pertaining to the government witnesses' biases and credibility, along with evidence of Yager's non-involvement in the crimes charged. (*See generally* Docket #2093). Again, Yager states that he is entitled to this information under the Fifth and Sixth Amendments, and as a result of the government's obligations under *Brady*, 373 U.S. at 83, and *Giglio v. United States*, 405 U.S. 150 (1972). (Docket #2093 at 3-14).

The Court will deny Yager's motion for these items at this juncture in light of the government's adherence to an open-file policy. (Docket #2100 at 12). The government has represented that it will provide all of the exculpatory information that Yager is entitled to under *Brady* and *Giglio*. (Docket #2100 at 12). In its brief, the government states that it understands, appreciates, and will comply with these obligations. (Docket #2100 at 12). Moreover, Yager's counsel has apparently not conferred with government counsel regarding this request (Docket #2100 at 12), in violation of Criminal Local Rule 16(b).

As such, Yager's motion to compel discovery related to the government's cooperating witnesses will be denied in its entirety without prejudice.

4. CO-CONSPIRATOR STATEMENTS

Yager moves the Court for an order requiring the government to provide notice of any co-conspirator statements that it intends to introduce

at trial. (*See generally* Docket #2095). He also asks the Court to determine the admissibility of those statements in the context of a *Santiago* hearing. (Docket #2095 at 2) (citing *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir. 1978)).

In order to admit co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), the government must prove, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134. The Court can use various procedures to determine the admissibility of co-conspirator statements both before and during trial.[4] United States v. Shoffner, 826 F.2d 619, 628-29 (7th Cir. 1987).

The Court will deny Yager's motion because "holding a full blown pretrial hearing for a decision which is not final is an inefficient means of resolving" preliminary admissibility issues such as this. *United States v. Andrus*, 775 F.2d 825, 837 (7th Cir. 1985). In the interest of efficiency, this Court prefers to handle such motions during trial and to allow the government to proceed at trial by way of proffer. *See, e.g.*, *United States v. VanDaalwyk*, 840 F.2d 494, 496 (7th Cir. 1988) ("The trial court in this case followed a procedure that we have long sanctioned. The court permitted the government to introduce at trial evidence of the statements on the basis of an offer of proof, subject to the condition that at the close of the government's case the defendant could move for a mistrial or for evidence of the statements

---

[4]For example, the trial court may "rule that certain statements were or were not in furtherance of a conspiracy as the statements are brought out at trial; it can require the government to make a proffer of the evidence it believes establishes the furtherance requirement or it can defer this ruling until the close of the government's case when, having heard all the evidence, it can make a hindsight determination that the requirement has been met." *Shoffner*, 826 F.2d at 628-29.

to be struck."); *United States v. Everett,* No. 10-CR-167, 2011 WL 2162790, at *1 (E.D. Wis. June 2, 2011) ("[I]t is the general practice of this district to not conduct a hearing or require a proffer in advance of trial."). Thus, Yager's motion will be denied as the Court will address the admissibility of any co-conspirator statements during trial.

Accordingly,

IT IS ORDERED that the defendant's motion to suppress evidence obtained as a result of a traffic stop in Silver Lake, New York (Docket #2091), be and the same is hereby HELD IN ABEYANCE pending the result of an evidentiary hearing to be held on December 23, 2015, at 10:30 a.m.;

IT IS FURTHER ORDERED that the defendant's motion for production and *in camera* review of certain presentence reports (Docket #2094) be and the same is hereby DENIED without prejudice;

IT IS FURTHER ORDERED that the defendant's motion to compel information related to potential witnesses (Docket #2093) be and the same is hereby DENIED without prejudice; and

IT IS FURTHER ORDERED that the defendant's motion for a pretrial ruling on the admissibility of co-conspirator statements (Docket #2095) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 2nd day of November, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge