UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                    Case No. 97-CR-98

RANDY YAGER,

    Defendant.

## JOINT FINAL PRETRIAL REPORT

The United States, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Scott J. Campbell, Laura S. Kwaterski, Assistant United States Attorneys, and Defendant Randy Yager, by his attorney Stephen Hurley, hereby submit the following Joint Pretrial Report.

### SUMMARY OF THE CHARGES

The indictment in this case charges that the defendant committed two crimes.

Count One of the Indictment charges the defendant with racketeering, that is, that the defendant knowingly conducted, or participated in the conduct of, the affairs of an enterprise that was engaged in, or whose activities affected, interstate or foreign commerce through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(c).

Count Two of the Indictment charges that the defendant conspired with other persons to conduct, or to participate in the conduct of, the affairs of an enterprise which was engaged in, or whose activities affected interstate or foreign commerce, through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d).

The Indictment alleges the following with respect to both Counts:

The American Outlaw Association, better known and hereinafter referred to as the Outlaws Motorcycle Club (OMC), was an international organization which engaged in, and the activities of which affected, interstate and foreign commerce and was composed of individual chapters located in various cities throughout the country. Outlaws Motorcycle Club chapters were grouped into color-coded geographic regions, each headed by a regional president or boss. The regions and each of the chapters therein fell under the authority of the national president who, during the time period covered by this indictment, was Harry Bowman, aka Taco. The White Region, sometimes referred to as the "Chicago Region," covered portions of the Midwest and included chapters located in Milwaukee, Wisconsin; Janesville, Wisconsin; LaCrosse, Wisconsin; Chicago, Illinois; Joliet, Illinois; Gary, Indiana; and for a time, Indianapolis, Indiana; and Peoria, Illinois.

Membership in the Outlaws Motorcycle Club was limited to males and was the result of a controlled process that included a probationary period and ended with a vote by the full chapter membership. Members were expected to abide by a written code; to follow the directives of their chapter, regional and national bosses; to attend weekly chapter meetings, known as "church;" to pay dues; and to attend chapter, regional and national events, known as "runs." Violations of these expectations could result in fines, expulsion, another probationary period, or physical violence. The vestments or "colors" of full club membership included a leather or denim vest with a back patch bearing the club emblem of skull with crossed pistons, surrounded by a top "rocker" with the word "Outlaws" and a bottom "rocker" identifying the member's chapter location. Other patches were optional.

The White Region of the Outlaws Motorcycle Club, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter the enterprise), that is a group of individuals associated in fact. This enterprise was engaged in, and its activities affected, interstate and foreign commerce. At all times relevant to this indictment, Randy M Yager, aka Mad, and others known and unknown, were leaders, members, and associates of the enterprise, which functioned as a criminal organization. From approximately June 25, 1994, until approximately June 10, 1997, Randy M. Yager, aka Mad, acted as the president or boss of the White Region, and in that capacity, he directed and oversaw the racketeering acts alleged in this indictment, including activity in the Eastern District of Wisconsin.

It was an object and purpose of the enterprise: (1) to protect and defend its Region, and to assist other Outlaws to protect and defend their Regions, that is, the geographical territory that the Outlaws Motorcycle Club leaders and members deemed to be within OMC control; (2) to dictate and control the activities of other motorcycle clubs that existed within its Region; and (3) to maintain the allegiance and loyalty of the OMC members, regardless of federal or state laws or social norms.

To accomplish these and other objects and purposes of the enterprise, the defendant, Randy M. Yager, aka Mad, and others known and unknown, used the following means and

methods, among others: (1) Acts involving violence and intimidation, including assaults on the persons and property of rival biker gang members including members of the Hells Angels Motorcycle Clubs and other motorcycle clubs allied with the Hells Angels such as the Hells Henchmen and the Invaders. Such assaults included, but were not limited to, murder, arson, and causing damage by explosives; (2) Acts involving violence and intimidation, including assaults on the persons and property of owners, managers, employees, and customers of businesses frequented by members of rival biker gangs, including the Hells Angels Motorcycle Club and other motorcycle clubs allied with the Hells Angels, such as the Hells Henchmen and the Invaders; and (3) Acts involving violence and intimation, including assaults on persons who were members of the OMC's own organization who were perceived as disloyal to the enterprise or cooperating with law enforcement. Such assaults ranged from beatings that caused physical injury to murder.

The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and (5) included the following acts:

Racketeering Act # 1 alleges that on or about June 26, 1994, the defendant committed the crime of conspiracy to commit murder in violation of the laws of the State of Indiana.

Racketeering Act # 2(a) alleges that between in or about July or August 1994 and August 31, 1994, the defendant committed the crime of conspiracy to commit arson in violation of the laws of the State of Indiana. Racketeering Act # 2(b) alleges that on or about August 31, 1994, the defendant committed the crime of arson, as party to a crime, in violation of the law of the State of Indiana.

Racketeering Act # 3(a) alleges that between on or about September 20, 1994, and September 25, 1994, the defendant committed the crime of conspiracy to commit murder, in violation of the laws of the State of New York. Racketeering Act # 3(b) alleges that on or about September 25, 1994, the defendant committed the crime of second-degree murder, as party to a crime, in violation of the law of the State of New York.

Racketeering Act # 4(a) alleges that between a date in or about September 1994 and on or about October 12, 1994, the defendant committed the crime of conspiracy to commit murder in violation of the law of the State of Illinois. Racketeering Act No. 4(b) alleges that on or about October 12, 1994, the defendant committed the crime of attempted first degree murder, as party to a crime, in violation of the laws of the State of Illinois. Racketeering Act No. 4(c) alleges that on or about October 12, 1994, the defendant committed the crime of arson, as party to a crime, in violation of the laws of the State of Illinois.

Racketeering Act # 5(a) alleges that between a date in or about August or September 1994 and on or about on or about November 7, 1994 the defendant committed the crime of conspiracy to commit murder in violation of the laws of the State of Illinois. Racketeering Act No. 5(b), alleges that on or about November 7, 1994, the defendant committed the crime

of attempted first degree murder, as party to a crime, in violation of the laws of the State of Illinois. Racketeering Act No. 5(c) alleges that on or about November 7, 1994, the defendant committed the crime of arson, as party to a crime, in violation of the laws of the State of Illinois.

Racketeering Act # 6(a) alleges that between a date in or about August or September 1994 and on or about on or about November 7, 1994, the defendant committed the crime of conspiracy to commit murder, in violation of the laws of the State of Illinois. Racketeering Act No. 6(b) alleges that on or about November 7, 1994, the defendant committed the crime of arson, as party to a crime, in violation of the laws of the State of Illinois.

Racketeering Act No. 7(a) alleges that on or about January 28, 1995, the defendant committed the crime of conspiracy to commit murder in violation of the law of the State of Indiana. Racketeering Act No. 7(b) alleges that on or about January 28, 1995 the defendant is alleged to have committed the crime of murder, as party to a crime, in violation of the law of the State of Indiana.

Racketeering Act # 8(a) alleges that between a date in or about January 1995 and on or about March 6, 1995, the defendant is alleged to have committed the crime of conspiracy to commit murder, in violation of the laws of the State of Illinois. Racketeering Act # 8(b) alleges that on or about March 6, 1995, the defendant committed the crime of murder, as party to a crime, in violation of the laws of the State of Illinois.

## ANTICIPATED LENGTH OF TRIAL

The parties anticipate that the trial will last 3-4 weeks.

## STIPULATIONS OF FACT BETWEEN THE PARTIES

The parties agreed stipulations are attached as Exhibit A.

The parties shall make good-faith efforts to arrive at additional stipulations regarding relevant undisputed facts before trial.

## POTENTIAL GOVERNMENT WITNESSES

The United States' Witness List is attached as Exhibit B.

## POTENTIAL DEFENSE WITNESSES

Randy Yager's Witness List is attached as Exhibit C.

# EXPERT WITNESSES

The United States anticipates calling the following persons as expert witnesses:

1.  **Richard Fogle, Fire and Arson Investigator, South Bend Fire Department**

The United States intends to call Richard Fogle during its case-in-chief as an expert in fire and arson investigations. Mr. Fogle is retired from his position as a Fire and Arson Investigator with the South Bend, Indiana Fire Department. Mr. Fogle began his career with the South Bend Fire Department in 1969, and held various positions in the department, including his position as a Fire and Arson Investigator from 1990 until his retirement in 1996. As a Fire and Arson Investigator, one of Mr. Fogle's responsibilities was to conduct fire and arson investigations to determine the cause and origin of fires. Mr. Fogle has received formal training in various types of fire and arson investigations and Mr. Fogle has personally worked or supervised more than 1,000 fire and explosion investigations. Mr. Fogle was, during the relevant time period, a certified Fire and Explosion Investigator and Certified Vehicle Fire Investigator. Mr. Fogle's additional training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit D.

Mr. Fogle will testify that he responded to the scene of a fire on August 31, 1994,at 807 W. Indiana, South Bend, Indiana, the Hell's Henchmen's clubhouse. Mr. Fogle will testify that, based upon his personal observations of the scene, examination of evidence, and his training and experience, he determined that the fire that occurred on August 31, 1994, at the Hell's Henchmen's clubhouse at 807 W. Indiana, South Bend, Indiana, was arson.

2.  **Dr. John Simich, Laboratory Director, Erie County, New York Central Police Services Forensic Laboratory.**

The United States intends to call Dr. John Simich during its case-in-chief as an expert in serology and DNA analysis. Dr. Simich is currently the Laboratory Director of the Erie County, New York Forensic Laboratory. From 1990 until 2001, Dr. Simich was a Senior Forensic Serologist with the Eric County Forensic Laboratory and from 1985 until 1990, Dr. Simich was a Forensic Chemist with the Erie County Forensic Laboratory. Dr. Simich obtained his doctorate in Experimental Pathology with a Concentration in Hemotology from Roswell Park Memorial Institute, a division of SUNY at Buffalo in 1990. Dr. Simich. Dr. Simich's additional training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit E.

Dr. Simich will testify that he was presented with a number of items recovered from the scene and investigation of a double homicide that occurred at Lancaster

Speedway in Lancaster, New York on September 25, 1994. Specifically, the United States will introduce evidence at trial that a leather Hells Angels vest was recovered from a vehicle Mr. Yager was driving on the morning of September 25, 1994, when he was stopped in the Town of Silver Creek, New York after leaving the Lancaster Speedway. Additionally, the United States will introduce evidence at trial that a bowie knife and a folding knife were recovered at or near the scene of the double homicide at the Lancaster Speedway on the morning of September 25, 1994. Dr. Simich will testify that he analyzed these items and DNA was extracted from the dried red stains identified on the leather vest, bowie knife, and folding knife. Dr. Simich also received a known blood sample of Michael Quale. Dr. Simich will testify that he compared the DNA extracted from the dried red stains from the leather vest, bowie knife, and folding knife, with the DNA extracted from the known blood sample of Michael Quale and the DNA profiles obtained from the dried red stains identified on the leather vest, bowie knife, and folding knife match the DNA profile from the known blood sample from Michael Quale. Dr. Simich will testify that, in his opinion, the only reasonable scientific explanation for these results is that Michael Quale is the source of the genetic material on the leather vest, bowie knife, and folding knife.

   3.  **Dr. Sungook Baik, Associate Chief Medical Examiner, Erie County Medical Examiner's Office**

The United States intends to call Dr. Sungook Biak during its case-in-chief as an expert in forensic pathology. Dr. Baik has been an associate chief medical examiner with the Erie County Medical Examiner's Office since 1982. Dr. Biak graduated from Kyungpook University School of Medicine in 1970 and did an internship in medicine at the Tongsan Presbyterian Hospital in Korea and then came to the United States and did his residency in pathology at St. Joseph's Hospital in Fort Wayne, Indiana. Dr. Baik then did a two-year residency in neuropathology at the Strong Memorial Hospital in Rochester, New York, and then went to the Wayne County Medical Examiner's Office in Detroit, Michigan for forensic pathology training. Dr. Baik is a board certified general pathologist and a board certified forensic pathologist. As the Associate Chief Medical Examiner in the Erie County Medical Examiner's Office, one of his duties and responsibilities is to conduct death investigations. Dr. Baik has testified in court as an expert in forensic pathology more than one hundred times. Dr. Baik's training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit F.

Dr. Baik will testify that he performed an autopsy of Michael Quale on September 25, 1994. Dr. Baik will testify that based upon his autopsy examination of Mr. Quale's body on September 25, 1994, in his opinion, to a reasonable degree of medical certainty, the cause of Mr. Quale's death was multiple stab wounds to the chest, back, and hips. Dr. Baik will testify that he performed an autopsy of Walter Posniak on September 25, 1994. Dr. Baik will testify that based upon his autopsy examination of Mr. Posniak's body, in his opinion, to a reasonable degree of medical

certainty, the cause of Mr. Posniak's death was a bullet wound to the right upper arm that penetrated his lung.

4.  **Guy Morice, ATF Special Agent and Certified Explosive Specialist**

The United States intends to call Guy Morice during its case-in-chief as an expert regarding types of explosive devices and post-blast investigations to determine the cause and origin of explosions. Mr. Morice is retired from his position as a Special Agent and Certified Explosive Specialist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, a position which he held from 1976 until his retirement in 2003. Mr. Morice became a certified explosive specialist in 1980. Mr. Morice has received formal training through the ATF and attended numerous trainings regarding post-blast investigations hosted by state and local law enforcement agencies. Mr. Morice has participated in more than one hundred investigations involving explosive devices and explosions. Mr. Morice's training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit G.

Mr. Morice will testify that he responded to the scene of an explosion on October 12, 1994 at 3129 Coleman Avenue in Rockford, Illinois, the home of Roger Fiebrantz, who was the president of the Hells Henchmen Motorcycle Club at that time. Mr. Morice will testify that, based upon his personal observations of the scene, examination of the evidence and damage, and his training and experience, in his opinion the explosion was caused by a high explosive and that the explosive device was electrically initiated and more likely than not it was electrically initiated by some type of connection to the wiring of the vehicle itself. Mr. Morice will also testify that he responded to the scene of a report of an explosive device that had been affixed to a vehicle on November 7, 1994 at 15th Street in Rockford, Illinois. Mr. Morice will testify that, based upon his personal observations at the scene, examination of the evidence and damage, and his training and experience, in his opinion the explosive device that was magnetically affixed to the vehicle, which detonated during the render safe procedure, was a low explosive that was intended to be initiated by an electric blasting cap.

5.  **Dale Distel, Explosive Technician, Chicago Police Department**

The United States intends to call Dale Distel during its case-in-chief as an expert regarding types of explosive devices and post-blast investigations to determine the cause and origin of explosions. Mr. Distel is retired from his position as an explosive technician with the Chicago Police Department. Mr. Distel began his career with the Chicago Police Department in 1977, and in 1981 became a detective. Of Mr. Distel's 26 years as a detective with the Chicago Police Department, he was assigned to the bomb and arson section for 25 years. Mr. Distel became a certified explosive technician in 1994, a position which he held until his retirement in 2006. As an explosive

technician, one of Mr. Distel's responsibilities was to conduct post-blast investigations to determine the cause and origin of the explosion. Mr. Distel has received formal training in investigating crimes involving the use of explosives and arson investigations. Mr. Distel was a certified arson investigator in the State of Illinois and attended the FBI's Hazardous Device School at Redstone Arsenal in Huntsville, Alabama, and received his certification as a hazardous device technician. The specialized training at the FBI's Hazardous Device School involved training regarding explosives, rendering safe explosives, disposal of explosives, crime scene analysis and post-blast investigations. Mr. Distel has testified as an expert on the cause and original of arson or cause and origin of explosions more than fifty times in civil and criminal cases.

Mr. Distel will testify that he responded to the scene of an explosion on November 7, 1994 at the Hell's Henchmen clubhouse at 1734 West Grand Avenue, Chicago, Illinois. Mr. Distel will testify that based upon his personal observations of the scene, examination of the damage and debris at the scene, and other evidence, and his training and experience, in his opinion, the explosion was caused by a high explosive that had been contained in a diamond-plate steel container that was placed on the passenger seat of the vehicle and that the vehicle was driven up on the sidewalk, parked directly next to the entrance door to the building, and was detonated remotely with a mechanical timing device.

6. **Reginald Templin, Firearm and Toolmark Examiner, Wisconsin State Crime Lab**

The United States intends to call Reginald Templin during its case-in-chief as an expert regarding firearm and toolmark examinations. Mr. Templin is retired from his position as a firearm and toolmark examiner with the Wisconsin State Crime Laboratory, a position which he held from 1982 until his retirement. Prior to his employment as a firearm and toolmark examiner with the Wisconsin State Crime Lab, Mr. Templin was employed by the Chicago Police Department Crime Laboratory, the Kansas City, Missouri Police Department's Regional Criminalistics Laboratory and Mr. Templin was in charge of the firearm and toolmarks section for approximately six years at the Northern Illinois Police Crime Laboratory. As a firearms and toolmarks examiner, Mr. Templin's duties included examining and reporting on firearms and firearm-related evidence, including firearms, fired cartridge cases, fired bullets, and tool marks. Mr. Templin has received formal training in the examination of firearms and toolmarks, including three years of on-the-job training and study with the with Chicago Police Department Crime Laboratory. Mr. Templin has testified previously as an expert regarding firearm and toolmark examinations. Mr. Templin's additional training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit H.

Mr. Templin will testify that he was presented with evidence, including fired bullet casings, fired bullet jackets, and lead bullet cores, recovered from the scene of the homicide of Jack Castle, which occurred in Chicago, Illinois on March 3, 1995 and during the autopsy of Mr. Castle. Mr. Templin will testify that he examined this evidence and concluded that the eleven fired .223 caliber cartridge casings were all fired from the same firearm and the nine fired bullet jackets revealed them to be .223 caliber and fired through a firearm barrel rifled with six lands and grooves and a right hand twist. Mr. Templin will testify that examination of the cartridge cases and fired bullet jackets reveal marks which are not consistent with being fired in a AK-type rifle or in an AR-15 type rifle and that the fired cartridge cases and fired bullet jackets have characteristics similar to .223 caliber rifles manufactured by Sturm Ruger (Mini 14).

7. **Kevin Judge, Deputy Commander and CSI Unit Manager, former Senior Firearm and Toolmark Examiner, Lake County Police Crime Laboratory**

The United States intends to call Kevin Judge during its case-in-chief as an expert regarding firearm and toolmark examinations. Mr. Judge is a Deputy Commander and the CSI Unit Manager with the Lake County Police Crime Laboratory in Lake County, Indiana. Mr. Judge held the position of Senior Firearms Examiner with the Lake County Police Laboratory for 22 years. Mr. Judge has received formal training in firearms and toolmark examinations and attended training at the Indiana State Police Crime Laboratory. Mr. Judge has personally worked on more than 700 firearm and toolmark examinations and Mr. Judge has testified as an expert regarding firearm and toolmark examinations over 150 times. Mr. Judge's additional training and education are set forth in detail in the attached curriculum vitae, attached as Exhibit I.

Mr. Judge will testify that he was presented with evidence recovered during the autopsy of Donald Fogg, including spent bullet jackets, a spent bullet core, and a small piece of metal. Mr. Judge will testify that he examined this evidence and concluded that of the spent bullet jackets he examined, he determined that one was fired from a .38 caliber weapon with five (5) lands and five (5) grooves having a right-hand twist.

## VOIR DIRE QUESTIONS

The government's proposed voir dire questions are attached as Exhibit J.

The defendant's proposed voir dire questions are attached as Exhibit K.

## EXHIBITS

The parties' proposed exhibit list is attached as Exhibit L.

## PROPOSED JURY INSTRUCTIONS

The parties' proposed jury instructions are attached as Exhibit M.

Respectfully submitted this <u>16th </u>day of March, 2016.

          GREGORY J. HAANSTAD
          United States Attorney

By: <u>s/ Carol L. Kraft</u>
   Carol L. Kraft, WBN 1000117
   Assistant United States Attorney

   <u>s/ Scott J. Campbell</u>
   Scott J. Campbell, WBN 1017721
   Assistant United States Attorney

And: <u>s/ Laura S. Kwaterski</u>
   Laura S. Kwaterski, WBN: 1055485
   Attorneys for Plaintiff
   Office of the United States Attorney
   Eastern District of Wisconsin

And: <u>s/ Stephen Hurley</u>
   Stephen Hurley, WBN: 1015654
   Attorney for Randy Yager
   HURLEY, BURISH & STANTON, S.C.