UNITED STATES OF AMERICA,

       Plaintiff,

      v.                          Case No. 97-CR-98

RANDY YAGER,

       Defendant

## STIPULATIONS

The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin and Carol L. Kraft, Scott J. Campbell, and Laura S. Kwaterski, Assistant United States Attorneys, and the defendant, Randy Yager, by his counsel, Stephen P. Hurley, hereby agree to the following stipulations, which may be read to the jury at the trial of this matter at counsel's choosing:[1]

1.     On June 10, 1997, while executing a search warrant at the Outlaws Motorcycle Clubhouse located at 1263 Cherry Street, Janesville, Wisconsin, special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, seized the following items which are Exhibits: 0-1, 0-3A through 0-3G, 0-4A, 0-4B, 0-5A, 0-6, 0-7.

2.     On June 10, 1997, while executing a search warrant at the residence of

---

[1] With respect to the documents referenced herein, the stipulation is to their authenticity, and both parties reserve the right to object to their admission on relevance or other proper legal grounds. The government reserves the right to introduce other evidence and testimony regarding the subject matter of these stipulations.

Case 2:97-cr-00098-JPS   Filed 03/16/16   Page 1 of 23   Document 2154-1

Chicago Chapter Outlaw member Richard Mroch located at 7332 West 59th Street, Summit, Illinois, officers of the Summit Police Department and special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives observed and seized the items which are depicted in photographs that are Exhibits 0-10C through 0-10 F, and the items that are depicted in Exhibits 0-11, 0-12 and 0-12B.

3.     On June 10, 1997, while executing a search warrant at the residence of Chicago Chapter Outlaw member Richard Mroch, located at 7332 West 59th Street, Summit, Illinois, officers of the Summit Police Department and special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives seized the notes and documents that are depicted in Exhibits 0-12C, 012D and 0-12E.

4.     On June 10, 1997, while executing a search warrant at the residence of Chicago Chapter Outlaw member Richard Mroch, located at 7332 West 59th Street, Summit, Illinois, officers of the Summit Police Department and special agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives seized the police call frequency guide that is depicted in Exhibit 0-12-F.

5.     On February 10, 1994, during a search of a truck owned by Wisconsin (Stateline) Outlaw member Johnson Blake, Fox Lake Illinois police officers seized a Wisconsin (Stateline) Outlaw member a holiday card that is Exhibit 0-15.

6.     Exhibit 0-14, Budget Rent a Car records, consisting of a rental contract and renter's notification for a Ford Aerostar van, rented on June 7, 1994, in the name of Kevin O'Neill, is an authentic and accurate copy of original records of acts, events or conditions

2

made at or near the time by someone with knowledge, or from information transmitted by, a person with knowledge, and generated as the regular practice of the business activity of Budget Rent a Car, and kept in the course of that regularly conducted business, and was certified to be such in January 1997, by Sharon Fletcher, a person qualified to do so.

7.     As of August 31, 1994, the real property, located at 807 W. Indiana, South Bend, Indiana, was a dwelling that served as a clubhouse of the Hells Henchmen Motorcycle Club.   As of August 31, 1994, that real property was owned by Hells Henchmen, Inc.

8.     Exhibit 206 is a true and accurate copy of an article which appeared in the South Bend Tribune, a newspaper, on September 1, 1994.

9.     Marilyn Schieber, if called to testify, would testify that on August 31, 1994, she was the owner of a two-door 1981 Oldsmobile Cutlass Supreme, dark green with a white Landau top, with Indiana plate #71-1700 and VIN 1G3AM47A7BM424107 depicted in Exhibit 2-2.    On August 31, 1994, at approximately 7:30 p.m., she parked her vehicle, which was unlocked, outside the Ponderosa restaurant where she worked and which was located at 311 East Ireland Road in South Bend, Indiana.    At approximately 10:00 p.m. that night, she saw that her vehicle was no longer in the parking lot.   At that time, she reported it stolen to the South Bend Police Department. Ms. Schieber would further testify that she did not give anyone permission to take or to destroy her vehicle; that as of 7:30 p.m. that evening, her vehicle did not contain an ax

3

handle, a cooler, or a "Phillips 66"-brand plastic gallon jug containing a liquid; and that as of August 31, 1994, the vehicle had a value of between $600 and $800, and contained personal property, including a pair of shoes, with an approximate value of $80, and a baseball bat, with an approximate value of $60, and personal papers.

10.    Exhibit 3-3A is an aerial photograph taken in the fall of 1994, near in time to the September 25, 1994 events at the Lancaster Speedway, by Robert Bachorski, an investigator from the New York State Police, and is a fair and accurate aerial depiction of the Lancaster Speedway at that time.

11.    Exhibits 3-3B through 3-3Z are photographs taken by Robert Bachorski and Lancaster Police investigator Richard Zuppelli on September 25, 1994, and fairly and accurately depict aspects of the Lancaster Speedway in Lancaster, New York, as they appeared on that date.  Exhibit 3-3N is a photograph of the Bowie knife that was subsequently determined to contain the blood of Michael Quale.

12.    Exhibit 3-4 is a video taken by investigators at the Lancaster Speedway on the morning of September 25, 1994, and fairly and accurately reflects the areas filmed there on that date.

13.    The following items were seized by law enforcement officers at various locations within the Lancaster Speedway on September 25, 1994: Exhibits 3-5, 3-8, 3-12, 3-13, 3-14 and 3-15.   Exhibits 3-9 and 3-10 were located and recovered by investigators on the same day on Gunnville Road, near the Lancaster Speedway.

4

14.     On September 25, 1994, troopers from the New York State Police stopped the following six individuals on Gunnville Road, approximately one mile from the Lancaster Speedway, after officers observed the pick-up truck in which two were traveling leave the speedway at a high rate of speed: Joseph Hawley from Indianapolis, Indiana; David Paul Thornton, from DePew, New York; Eugene Michael Marcaccio, from Buffalo, New York; Francis Andre Perotti, from West Bridgewater, Massachusetts; Edward Alemian from Weymouth, Massachusetts; and Brian Joseph Schaffer from Holland, Ohio.   Four of the six men were on motorcycles and two were in the pickup and all were traveling away from the Lancaster Speedway on Gunnville Road.   All six individuals were either wearing Outlaws colors or clothing, or identified themselves as Outlaws.   The following exhibits were seized from the six individuals: 3-16 and 3-18 through 3-30.   Exhibits 3-115 and 3-116 are accurate of photographs which fairly and accurately depict the six men as they appeared on September 25, 1994.

15.     Cheektowaga, New York, is a suburb of Buffalo, New York.   The Buffalo airport is located in Cheektowaga.   On the morning of September 25, 1994, after officers of the Cheektowaga Police Department heard a radio call concerning a double homicide at the Lancaster Speedway and a large group of motorcyclists leaving the speedway, they observed approximately 15 motorcyclists traveling west on Genesee Road in the vicinity of the Buffalo airport.   Some of the motorcyclists were wearing Outlaw colors. The following individuals were stopped:   Dennis Andrew Anderson from Evansburg, Pennsylvania; James W. Winchester from Witman, Maine; Thomas Edwin Gaines from

White Lake, Michigan; Bryan J. Karas from Buffalo, New York; Cameron Donald Ross from Detroit, Michigan; Joseph K. Cervenia from Sandusky, Ohio; Albert Usher from Welkville, New York; Daniel Anthony Novak from St. Clair Shores, Michigan; Nicholas Y. Cyr from North Quincy, Massachusetts; and Daniel Matter from Sandusky, Ohio. At the time of the stop, three from the original group of motorcyclists turned and attempted to flee. After a pursuit, one of them, David J. Casey, of Michigan was stopped. Officers of the Cheektowaga Police Department searched the roadside in the stretch of Genessee Road by which the motorcyclists had passed prior to being stopped. The officers had no knowledge about how many other vehicles had traveled over this stretch of Genessee Road before the motorcycles were stopped that morning. Exhibits 3-41 through 3-44 were found and seized. Exhibits 3-31A through 3-31V are photographs which fairly and accurately depict the items located and recovered by the officers by the side of Genessee Road on September 25, 1994 and the individuals who were stopped. Exhibit 3-31 O is a photograph of a knife that was subsequently determined to contain the blood of Michael Quale.

16.     Amherst, New York, is a northern suburb of Buffalo, New York, located just to the west of Lancaster. On the morning of September 25, 1994, at approximately 9:39 a.m. officers of the Amherst Police Department received a radio call advising officers to stop all motorcycles leaving the Lancaster area because there was an incident at the Lancaster Speedway. They stopped a motor home in which the following individuals were traveling: George R. Slates, Jr. from Steubenville, Ohio; John Soldo

6

from Bethel Park, Pennsylvania; Charles Meyers from Toronto, Ohio; Michael Gregg from Imperial Pennsylvania and John Brock from New Cumberland, West Virginia. All of the individuals were members of the Barbarians Motorcycle Club. The officers subsequently searched the motorhome. The following items were discovered in the motor home: Exhibits 3-46, 3-48, 3-50, 3-52, 3-54, 3-58, 3-64, 3-65A, 3-65B, 3-67 through 3-69, 3-71 and 3-72. Exhibits 3-45A through 3-45Z are photographs which fairly and accurately depict the motor home, its occupants and the interior of the motor home, as they appeared on September 25, 1994.

17.    On September 25, 1994, other law enforcement officers stopped other motorcycles and vehicles traveling away from the Lancaster Speedway, whose operators where not members of the Outlaw Motorcycle Club.

18.    On September 27, 1994, officers from the Town of Lancaster Police Department and other law enforcement officers searched a 1979 Buick Park Avenue bearing Massachusetts license plate 139DSH. Exhibits 3-84, 3-85 and 3-88 were among the items seized during the search. Exhibits 3-3AA, 3-3BB and 3-3CC are photographs which fairly and accurately depict the appearance of the car and its contents on September 27, 1994.

19.    On September 28, 1994, officers from the Town of Lancaster Police Department and other law enforcement officers searched a van belonging to Walter Posniak. Exhibits 3-3GG and 3-3HH are photographs which fairly and accurately depict some of the items that were in the interior of the van. The 3-3GG depicts a

7

handgun case. No handguns were found in the van. A shotgun, transceivers and knife cases were also found in the van. The shotgun is depicted in Exhibit 3-3HH. All of the items were returned to relatives of Walter Posniak.

20.     Exhibits 3-1A through 3-1L, records of the Fairfield Inn, Lancaster, New York, consisting of room registration records are true and accurate copies of the motel's record of activity for the dates reflected therein, and were made at or near the times reflected in the documents by someone with knowledge and were kept in the course of the regular practice of business activity of the business. The making of the record was a regular practice of the business activity and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

21.     Exhibits 3-2A-3-2D, records of the Econo-Lodge, Blasdell, New York consisting of original room registration records, are true and accurate records of the motel's record of activity for the dates reflected therein, and were made at or near the times reflected within the documents by someone with knowledge and were kept in the course of the regular practice of business activity of the business. The making of the record was a regular practice of the business activity and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

22.     Exhibits 3-77, 3-79, and 3-81 are bank deposit bags distributed by New Lenox State Bank to its commercial account holders for the purpose of banking deposits; that these bags are of the type that were used by New Lenox commercial customers during the time period which included September of 1994. Exhibit 3-132 are copies of

8

business account signature cards for Ronald Talmadge, a commercial account holder at New Lenox State Bank, doing business as Talmadge Auto Sales and as Tom and Betty's Tap. Exhibit 3-132 is a true and accurate copy of the financial institution's record of activity for the dates reflected therein, and were made at or near the times reflected within the documents by someone with knowledge and were kept in the course of the regular practice of business activity of the business. The making of the record was a regular practice of the business activity and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

23.     John Germano, if called to testify, would state that he is retired from the Winnebago County, Illinois Sheriff Department where he was formerly employed as a crime scene technician. On October 12, 1994, in his capacity as a Winnebago County Sheriff crime scene technician, he responded to a vehicle explosion at 3129 Coleman Avenue, Rockford, Illinois. From that location, he was directed to Rockford Memorial Hospital in Rockford, Illinois where doctors were treating Roger Fiebrantz. Exhibit 4-5 is a photograph of Roger Fiebrantz's legs, which he took on the evening of October 12, 1994. The photograph accurately depicts the injuries to Roger Fiebrantz's legs as they appeared at Rockford Memorial Hospital that night. Mr. Germano would further testify that on October 12, 1994, and again on November 1, 1994, he also collected from hospital personnel, metal fragments that doctors removed from Roger Fiebrantz's legs during medical procedures to treat his injuries.

24.     Peter Simet, if called to testify, would state that he is retired from his

9

position as a detective assigned to the Milwaukee Police Department auto theft investigation squad, a position which he held from 1982 until the date of his retirement. During that time Detective Simet developed an expertise in the investigation of crimes involving motor vehicles and the valuation of the same. Mr. Simet examined pictures of the Chevrolet, 4-door crew cab pickup truck with a flatbed car-hauling back, depicted in Exhibit 4-2; and the 1976 Chevrolet Blazer with a lift kit and custom tires and wheels, depicted in Exhibits 5-1A and 5-1B. Detective Simet would testify that after viewing photographs of the vehicles, and considering the condition of each and the added options, specifically the flatbed car-hauling apparatus on the pick-up truck and the lift kit and custom tires and wheels on the Blazer, it is his opinion that, as of the fall of 1994, the Chevrolet pickup with the flatbed car hauler depicted in Exhibit 4-2, had a minimum value of $2,500 and a maximum value of $5,000, and that the 1978 Chevrolet Blazer, depicted in Exhibits 5-1A and 5-1B, had a value of at least $5,000.

25. James Barton, if called to testify, would state that he is retired from the Rockford Illinois Police Department where he was formerly a detective assigned to the bomb squad. He had been trained as an explosives investigator at the FBI Army Bomb Data School in Huntsville, Indiana, and was assigned to the Rockford Police Department bomb squad starting in 1985. On November 7, 1994, Detective Barton responded to an assignment in an alley to the rear of a residence at approximately 9th and 15th Street in Rockford, Illinois. At that location, he observed a Chevrolet Blazer that was reported to have an explosive device attached to the underside. Det. Barton donned a bomb suit and

10

approached the vehicle, got down on the ground and looked at the underside. He observed a black canister, similar to the type of propane tank typically used with a camp stove. He observed that the object was approximately 6 inches in diameter, and approximately 8 to 10 inches long and was attached to the frame of the vehicle with what appeared to be a two-sided magnet. He further observed a wire running through a spring, which he believed to be attached to the drive shaft. Within a week of his observations, Det. Barton made a mock-up of the device. Exhibit 5-2 contains Polaroid photographs of his mockup.

26.     Detective Barton would further testify that on November 12, 1990, he responded to 1622 West State Street, Rockford, Illinois, an address that was then the clubhouse of the Rockford chapter of the Hell's Henchmen. At that location he observed a device that had been positioned at the rear door of the building between the outer screen door and the inner door. He took Polaroid photographs of the device which are Exhibits 0-32A and 0-32B. The device was remotely removed by a bomb squad officer from the Winnebago County Sheriff Department, but was unexpectedly detonated after being positioned into the Winnebago County Sheriff's bomb containment trailer.

27.     Shefali Purohit, if called to testify, would state that in 1994, she and her husband Divyesh Purohit lived at 8892 Jody Lane in Des Plaines, Illinois, and they owned a 1989 Ford Taurus bearing license plate number EESHA92 with VIN 1FABP5004KG143182.  Ms. Purohit would further testify that she parked her vehicle outside of her residence on October 15, 1994, and her neighbor saw it there at

approximately 9:00 a.m. on October 16, 1994. Ms. Purohit noticed it was missing at 10:00 a.m. on October 16, 1994. The vehicle was reported stolen to the Des Plaines police department on October 16, 1994.

28. Robert Sherwin, if called to testify, would state that he is retired from his position as a detective assigned to the Chicago police department's bomb and arson unit. Detective Sherwin would testify that on November 7, 1994, he responded to the scene of an explosion at the Hells Henchman clubhouse located at 1734 W. Grand Avenue, in Chicago, Illinois. While on the scene, he and other officers canvassed the area and identified a building located on the same side of Grand Avenue as the Hells Henchman clubhouse that had surveillance video cameras. On the morning of November 8, 1994, Detective Sherwin recovered the original surveillance video taken by those cameras the night before. Exhibit 6-3 is a true and accurate copy of the original surveillance video, excerpted to the relevant time frame of the explosion. The surveillance video fairly and accurately depicts images from three vantage points, two of which are views of Grand Avenue. The time-stamp on the surveillance video is set one hour ahead of the actual time.

29. Exhibits 8-6 is a title history for a 1976 Chevrolet Caprice, bearing VIN 1N39U6S162121, certified by the Illinois Office of the Secretary of State, as an authentic original record of acts, events or conditions made at or near the time by, or from information transmitted by, a person with knowledge and that such records are generated as the regular practice of the business activity of the Illinois Secretary of State,

12

and kept in the course of that regularly conducted business. Exhibit 8-6A is an excerpt of the same.

30.     An attorney with the of the City of Chicago Department of Revenue, if called to testify, would state he oversees official records generated and kept in the normal course of business by the City of Chicago Department of Revenue, including records that concern parking violations, and that in January 2000, he searched those records for citations issued for parking violations in the City of Chicago on March 3, 1995.  Exhibits 8-7A through 8-7D, are copies of authentic original records of acts, events or conditions made at or near the time by, or from information transmitted by, a person with knowledge and that such records are generated as the regular practice of the business activity and consist of a computer generated record, and two copies of traffic citations, which were issued by officers of the City of Chicago Police department on March 3, 1995, at 11:00 a.m. and March 3, 1995, at 7:40 p.m. to a Chevrolet automobile with VIN 1N39U6S162121, bearing Illinois license plate HCL729, for unlawfully parking in a handicapped space.

31.     Exhibit 8-8 is an copy of the domestic business incorporation documents for All Will County Auto Parts and Wreckers, Inc. certified by the Illinois Office of the Secretary of State, as an authentic original record of acts, events or conditions made at or near the time by, or from information transmitted by, a person with knowledge and that such records are generated as the regular practice of the business activity of the Illinois Secretary of State, and kept in the course of that regularly conducted business.

13

32.     A record custodian of the All Will County Auto Parts and Wreckers, Inc. 1014 Washington Street, Joliet, Illinois, if called to testify, would state that Exhibit 8-9 consisting of a vehicle pick-up order dated March 6, 1995, for a 1976 Chevy Caprice, 4 door, bearing VIN 1N39U6S162121 is an authentic and accurate duplicate copy of an original record of acts, events, or conditions made at or near the time by, or from information transmitted by, a person with knowledge, and that such records are generated as the regular practice of the business activity of All Will County Auto Parts and Wreckers, Inc., and kept in the course of that regularly conducted business. Further, that Exhibit 8-9 B is a copy of the junking certificate that All Will Auto received from the State of Illinois for this vehicle.

33.     Dr. Miles Jones was a pathologist employed by the Lake County, Indiana Coroner's Office in January 1995. On January 29, 1995, beginning at 8:15 am, he performed an autopsy on the body of Donald Fogg. He was assisted by pathologist's assistants Charlene Bulot and Jeffery Lewis. Dr. Jones observed Fogg to be a well-nourished, white adult male, appearing the stated age of 34 years. Fogg's body was determined to be 6'7" and to weigh 280 pounds. Dr. Jones observed that Fogg has a tattoo that depicted a skull and crossed pistons and the words "Outlaws Indiana," on his right forearm and a tattoo that depicted crossed pistons with the words "God Forgives, Outlaws Don't," on his left forearm. Exhibits 7-4A and 7-4B depict those tattoos. During the autopsy, Dr. Jones observed that Fogg had sustained a close-range gunshot entrance wound to his left upper lip with a corresponding exit wound to the mid portion of the

Case 2:97-cr-00098-JPS   Filed 03/16/16   Page 14 of 23   Document 2154-1

neck. He observed an additional gunshot entrance wound to the right posterior neck, with a corresponding exit wound to the left forehead. He observed a third gunshot entrance wound to the left lateral neck. There was no exit wound and a deformed bullet jacket and bullet fragments were removed from Fogg's head and placed in a bullet box by Charlene Bulot. Exhibit 7-4C is a photograph of the bullet and bullet fragments removed from Donald Fogg during autopsy. Exhibit 7-5 is a true and correct copy of a diagram, detailing the location of the gunshot injuries prepared at autopsy. During internal exam, Dr. Jones noted hemorrhage to the scalp, the epidural and subdural and subarachnoid brain hemorrhage. The cause of death was multiple gunshot injuries.

34.     Exhibit number 7-7 is a certified copy of Donald Fogg's death certificate, document 95-0200, a public record made and maintained in the normal course of business by the Indiana State Department of Health.

35.     At the time that Donald Fogg's body was received by the coroner for autopsy he had the following items on his body: a large silver ring with the words "Outlaws Indiana," and a skull and crossed pistons; a silver ring with a black stone; a silver ring with a skull and crossed pistons; a gold ring with a dark stone; a pierced earring; a silver chain with a skull and crossed pistons; a Page America brand pager; a silver bracelet with the word "Don"; a one hundred dollar bill; a fifty dollar bill; a twenty dollar bill; three one dollar bills; eight quarters; three dimes; and six pennies.

36.     If called to testify, Lt. John Pruzin would testify that on February 2, 1995, he and Lake County Police Crime Laboratory Investigator Traci Harbin received one

sealed bullet box containing a spent bullet and two spent fragments from Charlene Bulot, and placed them on inventory under case number 95001500 at the Lake County Police Crime Laboratory.

37.     Dr. Nancy Jones, if called to testify, would state that she is a board certified forensic pathologist and in 1995 she was employed as an assistant medical examiner for Cook County, Illinois where she had worked since 1986.   Dr. Jones received her medical degree from the Finch University of Health Sciences, Chicago Medical School in North Chicago, Illinois, and thereafter did a two-year anatomic pathology residency and a two-year clinical pathology residency at the University of Chicago followed by a one-year fellowship in forensic pathology at the Robert J. Fine Institute of Medicine in forensic pathology.   Dr. Jones is board certified in both forensic pathology and anatomic and clinical pathology. As an assistant medical examiner for Cook County, Dr. Jones performed autopsies or postmortem examinations to determine the cause and manner of death.   She is an expert in the field of forensic pathology.

On March 4, 1995, Dr. Jones performed an autopsy examination on the body of Jack Castle.   Dr. Jones would testify that Mr. Castle's body arrived at the medical examiner's office on March 3, 1995, at 9:50 am. At that time, Mr. Castle was wearing a grey, hooded sweatshirt and a black T-shirt with a picture and the logo, "Hell's Angels, East End." Exhibit 8-11 is a photograph of the T-shirt taken at the medical examiner's officer after it was removed from Mr. Castle's body. Mr. Castle was also wearing dark gray or black denim jeans, a brown belt and a white T-shirt. The significant findings on

the clothing was that the upper clothing had numerous holes, especially on the left side and they were stained with blood and brain matter. Dr. Jones conducted both an external and internal exam of the body. On her external examination, Dr. Jones observed several tattoos, including a tattoo of the words "Hells Angels." She further observed gunshot wounds, all on the left side of the body, distributed from his head, left chest region, and left arm with a few on the back. These included a large area on the left face that presented as a large laceration or tear more than three inches in length, which appeared to be composed of three separate gunshot wounds and which caused marked destruction and multiple fractures of the bones of the face and head. Dr. Jones counted 11 separate gunshot entrance wounds and also observed a total of four graze wounds on the chest, the area above the collar bone, and the back. There were no exit wounds to the torso. Exhibit 8-10 is a diagram prepared by Dr. Jones that illustrates the location of the gunshot wounds she observed during autopsy.

Dr. Jones would testify that some of the entrance wounds appeared normal in size and shape and others appeared large and atypical. Dr. Jones observed several abrasions to the left chest and arm region and observed that the left forearm and upper arm were broken and deformed. Several gunshot wounds to the arm had exit holes, and the projectiles from these wounds may have re-entered the torso.

On internal exam, Dr. Jones determined that the wound paths traveled from left to right, with bullets fragmenting and scattered throughout the chest and head area. The rib cage on the left side showed multiple fractures, and Dr. Jones observed a large

17

amount of blood in the chest cavity and also in the sac that sits around the heart. She removed a piece of shrapnel from the heart. She also recovered projectiles from other parts of the body, including a small copper jacketed bullet from the right side of the face at the jaw angle of the face where the neck and face come together; and a deformed copper jacket and small caliber lead bullet on the right side where the cranial spine meets the thoracic spine. There was a marked destruction of the body with shattering of bone and tissue and actual fragmentation of bullets. There was massive destruction to the brain due to the multiple fractures of the skull bones and facial bones. The internal exam of the left arm, with radiographs and recovery of projectile elements showed marked lacerations and destruction of the soft tissue, muscle and skin. On x-ray, Dr. Jones observed a snowstorm effect of lead fragments and copper jacket fragments throughout the arm. She would explain that, to a forensic pathologist, this means that a bullet struck the body with such intensity and kinetic energy that it literally scattered multiple small metal pieces throughout the area, so that on autopsy, it looked like snowflakes in a large snowstorm.

Dr. Jones also observed injures that she characterized as "dicing," which occur when glass strikes a body at a high velocity. These injuries were consistent with Castle having been shot through a closed car window. Based on the appearance of the gunshot wounds and the massive destruction of the body, Dr. Jones opined that Castle was shot with a high power rifle. She determined the cause of death to be multiple gunshots.

38. The death of Jack Castle occurred in Cook, County, Illinois. The Cook

County, Illinois State's Attorney's Office, the Illinois Attorney General's Office and the United States Attorney's Office for the Northern District of Illinois, all have jurisdiction to prosecute criminal offenses. To date, no one has been prosecuted by those offices for the death of Jack Castle.

39.     Exhibit 211 is a true and accurate copy of an article which appeared in the Gary, Indiana "Times," a newspaper, on Monday, November 28, 1994.

40.     The death of Donald Fogg occurred in Lake County, Indiana. The Lake County Indiana Prosecutor's Office, the Indiana Attorney General's Office and the United States Attorney's Office for the Northern District of Indiana all have jurisdiction to prosecute criminal offenses. To date, no one had been prosecuted by those offices for the death of Donald Fogg.

41.     Exhibit 8-12 is a certified copy of Jack Castle's death certificate, a public record made at the Medical Examiner-Coroner's Office in Cook County, Illinois, in the normal course of business, and maintained in the records of the State of Illinois.

42.     Exhibit 0-41, Exhibit 225is a true and accurate copy of Cellular One's record of the telephone bill which it sent to Kevin O'Neill for mobile number 414.939.3209 for the period June 15, 1994 through July 15, 1994.   The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of Cellular One; making the record was a regular practice of that activity; and neither the source of information nor the method nor other circumstances indicate a lack of trustworthiness.

43.     Exhibit 226 is a true and accurate copy of the records of the telephone bills of AT&T, Ameritech, MCI Telecommunications, Oncor Communications, Inc, Zero Plus Dialing, Inc., and LDDS MetroMedia Communications, Inc., Patricia (Morris) Wolf for telephone number 708.546.7901 for the period March 1, 1994 through June 1, 1994. The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

44.     Exhibit 227 is a true and accurate copy of the records of the telephone bills of Ameritech, AT&T and MCI Telecommunications for Patricia (Morris) Wolf for telephone number 414.633.8248 for July 28, 1994 through November 28, 1994. The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

45.     Exhibit 228 is a true and accurate copy of the telephone bills of AT&T, Ameritech, and Zero Plus Dialing, Inc. for Patricia (Morris) Wolf for telephone number 414.633.8248 for December 28, 1994. The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly

conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

46.    Exhibit 229 is a true and accurate copy of the telephone bills of AT&T and Ameritech for Patricia (Morris) Wolf for telephone number 414.633.8248 for January 28, 1995. The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

47.    Exhibit 230 is a true and accurate copy of the record of the phone bills Ameritech and Touch 1 for Edward Anastas for telephone number 414.383.0849 for October 7, 1996.  The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

48.    Exhibit 231 is a true and accurate copy of the telephone company's record of activity for telephone number 608.637.8785 for calls placed from the Vernon County Jail the week of June 26, 1994 - July 3, 1994.  The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a

regularly conducted activity the aforementioned telecommunications company; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

49.     Exhibit 0-42 is a true and accurate copy of the record of the telephone bills of Ameritech for Edward Anastas for telephone number 414.383.0849 and for Jean Heeti for telephone number 414.383.1938.   The record was made at or near the times reflected within the document by someone with knowledge; was kept in the course of a regularly conducted activity of each of the aforementioned telecommunications companies; making the record was a regular practice of that activity; and neither the sources of information nor the method nor other circumstances indicate a lack of trustworthiness.

50.     If called to testify, Bridget Pettengill would testify that in June 1994, she lived with her husband, Christopher Pettengill, and the telephone number at their residence was (608) 437-3248.

51.     Randy Yager was in the government's exclusive custody from February 6, 1986 until February 6, 1992.

GREGORY J. HAANSTAD<br>
United States Attorney

By:

s/Carol L. Kraft
CAROL L. KRAFT
SCOTT J. CAMPBELL
LAURA S. KWATERSKI
Assistant United States Attorneys

s/Stephen P. Hurley
STEPHEN P. HURLEY
Attorney for Randy Yager