UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 97-CR-98

RANDY M. YAGER, a/k/a "Mad,"

Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Gregory J. Haanstad, United
States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Scott J. Campbell and
Laura S. Kwaterski, Assistant United States Attorneys, and the defendant, Randy Yager,
individually and by attorney Stephen P. Hurley, pursuant to Rule 11 of the Federal Rules of
Criminal Procedure, enter into the following plea agreement.

### CHARGES

2.     The defendant has been charged in a two-count second superseding indictment,
which alleges violations of Title 18, United States Code, Sections 1962(c) and (d).

3.     The defendant has read and fully understands the charges contained in the
indictment.  He fully understands the nature and elements of the crimes with which he has been
charged.  Mr. Yager acknowledges that he has had the opportunity to adequately discuss those
charges and the terms and conditions of the plea agreement with his attorney.

4.     The defendant voluntarily agrees to plead guilty to Counts One and Two of the second superseding indictment, attached to this plea agreement as <u>Attachment A</u>, and incorporated as if fully set forth herein.

5.     The defendant understands and agrees that if the matter had proceeded to trial, the government could prove beyond a reasonable doubt each and every fact set forth in the second superseding indictment as well as the following facts set forth in subparagraphs 5(a)-5(i) below. The government asserts that the factual basis for the plea may be found in the facts set forth in the second superseding indictment as well as the following facts:

a.     During the 1990's the Outlaw Motorcycle Club was a national/international organization. In the United States, the club consisted of chapters that were grouped into regions that included Florida chapters, collectively known as the Orange Region; southeastern chapters, collectively known as the Gray Region; northeastern chapters, collectively known as the Blue Region; and Midwestern chapters, collectively known as the White Region.

b.     Each chapter and region had a leadership structure. The club as a whole had strict membership requirements that demanded the complete loyalty of all members and further demanded that members of the various regions support the chapters in other regions throughout the Outlaw nation.

c.     From approximately 1992 until June 26, 1994, the defendant was the chapter boss of the Gary Chapter. Starting on June 26, 1994, he became first the acting regional boss and later the permanent regional boss of the White Region.

2

d.   During the time period alleged in the indictment, the Outlaws already had a longstanding rivalry with the Hell's Angels and their affiliate clubs, which included the Invaders, the Hell's Henchmen, and the Sons of Silence. Until approximately 1993, the Outlaws "controlled" the Wisconsin-Illinois-Indiana territory that made up the White Region in that there were no Hell's Angel chapters within that territory. The closest Hell's Angel chapter consisted of a single chapter located in Minneapolis.

e.   Beginning in late 1993 or early 1994, Outlaw bosses and members came to believe that the Hell's Angels were attempting to gain a presence in the White Region territory by "patching over" the Hell's Henchmen, a club which had chapters located in Chicago, Rockford, and Calumet City, Illinois, and South Bend, Indiana.

f.   As the result, the Outlaw bosses and members, including the defendant, agreed that they would engage in a series of assaults against members for the purpose of attempting to discourage the Hell's Henchmen chapters and members from becoming Hell's Angel chapters and members and, further, to discourage the Hell's Angels from further attempts to "infiltrate" other geographic areas that had been traditionally known as Outlaw territory. Additionally, the Outlaw bosses and members of the White Region agreed that they would engage in similar activity in other regions when called upon to assist chapters in those other regions that were engaged in similar rivalries with enemy clubs.

3

g.  Thereafter, various members of the White Region of the Outlaws committed the offenses that are described in Racketeering Acts 1 through 8 of the second superseding indictment.

h.  The defendant acknowledges and agrees that if this case were to proceed to trial, the government could prove beyond a reasonable doubt: (1) that the defendant did in fact conduct and participate, directly and indirectly, in the conduct of the affairs of the Outlaws Motorcycle Club's White Region enterprise, which was engaged in, and whose activities affected, interstate commerce through a pattern of racketeering activities, and (2) that the defendant did in fact commit or caused to be committed each of the unlawful conduct alleged in Acts 1, 2, 3, 4, 5, 6, 7, and 8 in Count One of the Indictment in the furtherance of the affairs of the Outlaw Motorcycle Club's White Region.

i.  The defendant acknowledges and agrees that if this case were to proceed to trial, the government could prove beyond a reasonable doubt that the defendant did in fact conspire and agree that Acts 1, 2, 3, 4, 5, 6, 7 and 8, incorporated by reference into Count Two, be committed in the furtherance of the affairs of the Outlaw Motorcycle Club's White Region.

Mr. Yager makes no objection to the factual basis.

## PENALTIES

6.  The parties understand and agree that both of the offenses to which the defendant will enter a plea of guilty carry the following maximum term of imprisonment and fine: the duration of the defendant's life and a $250,000 fine. Both counts also carry a mandatory special assessment of $100, and up to five years of supervised release.

4

7.    The defendant acknowledges, understands, and agrees that he has had the opportunity to adequately discuss the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

8.    The parties understand and agree that in order to sustain the charge of racketeering, as set forth in Count One of the Second Superseding Indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the White Region of the Outlaws Motorcycle Club was an enterprise; and

Second, that the defendant was associated with the enterprise; and

Third, that the defendant knowingly conducted or participated in the conduct of the affairs of the White Region of the Outlaws Motorcycle Club through a pattern of racketeering activity as described in Count One; and

Fourth, that the activities of the White Region of the Outlaws Motorcycle Club affected interstate commerce.

9.    The parties understand and agree that in order to sustain the charge of RICO Conspiracy as set forth in Count Two, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant knowingly conspired to conduct or participate in the conduct of the affairs of the White Region of the Outlaws Motorcycle Club, an enterprise, through a pattern of racketeering activity as described in Count One of the indictment; and

Second, that the White Region of the Outlaws Motorcycle Club was an enterprise; and

Third, that the activities of the White Region of the Outlaws Motorcycle Club affected interstate commerce.

5

## SENTENCING PROVISIONS

10.     Pursuant to Rule 11(c) (1) (C) of the Federal Rules of Criminal Procedure, and based on an individualized assessment of the defendant and the factors set forth in 18 U.S.C. § 3553(a), the parties agree that a sentence of 15 years is the appropriate disposition of the case, and understand that if the Court accepts this plea agreement, the Court will be bound by this recommendation.

11.     The parties further agree that, pursuant to Rule 11(c) (2) of the Federal Rules of Criminal Procedure, the parties will request that the Court allow the parties to disclose the plea offer in camera to avoid generating any undue publicity that might jeopardize the fairness of an eventual trial in case the Court rejects the proposed plea agreement.

12.     The parties further agree that, pursuant to Rule 11(c)(5) of the Federal Rules of Criminal Procedure, should the Court reject the plea agreement, the parties will request that the Court make the required record in camera to avoid generating any undue publicity that might jeopardize the fairness of an eventual trial.

13.     The parties agree to waive the time limits set forth in Federal Rule of Criminal Procedure 32 relating to the presentence report, including the requirement that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the Court at the change of plea hearing.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that he has had the opportunity to adequately discuss with his attorney the applicable sentencing guidelines provisions.

6

## Sentencing Guidelines Calculations

15.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines.

## Offense Level

16.     The parties agree to recommend to the sentencing court that the racketeering and racketeering conspiracy offenses set forth in Counts One and Two of the Second Superseding Indictment, respectively, group under United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2(d) because they represent a composite harm.

17.     The parties further agree to recommend to the sentencing court that the guideline applicable to violations of 18 U.S.C. §§ 1962(c) and (d), as set forth in Counts One and Two of the Second Superseding Indictment, respectively, is U.S.S.G. §§ 2E1.1(a), which states the base offense level is 19 or the offense level applicable to the underlying racketeering activity, whichever is higher.  The parties further agree to recommend to the sentencing court that because each of the eight racketeering acts incorporated into Count Two embodies a separate violent offense that is a violation of a state statute, each act is calculated individually under its applicable advisory sentencing guideline provision under U.S.S.G §1B1.2(d).

18.     The parties agree to recommend to the sentencing court that the eight racketeering acts set forth in Count One and incorporated into Count Two have the following base offense levels:

      a.     Racketeering Act #1, conspiracy to murder members of Invader's Motorcycle Club at the Illiana Speedway has a base offense level, under U.S.S.G. §2 A1.5(a), of 33.

7

b. Racketeering Act # 2, arson of the Hell's Henchmen Motorcycle Club in South Bend, Indiana, has a base offense level, under U.S.S.G. § 2K1.4, of 24.

c. Racketeering Act # 3, conspiracy to commit murder of Michael Quayle at Lancaster Speedway has a base offense level, under U.S.S.G. §2 A1.1(a), of 43.

d. Racketeering Act # 4, Roger Fiebrantz truck bombing, by virtue of involving an assault to commit murder and a victim whom the parties stipulate sustained permanent and life-threatening bodily injury, has a base offense level, under U.S.S.G. §§ 2A2.1(a)(1) and 2A2.1(b)(1)(A), of 37.

e. Racketeering Act # 5, Michael Coyne truck bombing, by virtue of involving an assault to commit murder but a victim who suffered no personal injuries, has a base offense level, under U.S.S.G. §§ 2A2.1(a)(1), of 33.

f. Racketeering Act # 6, conspiracy to commit murder and arson at Hells Henchmen's Grand Avenue, Chicago Clubhouse, by virtue of involving an assault to commit murder but a victim who suffered no personal injuries, has a base offense level, under U.S.S.G. §§ 2A2.1(a)(1), of 33.

g. Racketeering Act # 7, murder of Donald Fogg has a base offense level, under U.S.S.G. § 2A1.1(a), of 43.

h. Racketeering Act # 8, murder of Jack Castle has a base offense level, under U.S.S.G. § 2A1.1(a), of 43.

8

19.     The parties further agree to recommend to the sentencing court that the combined offense level for Counts One and Two is determined by taking the offense level applicable to the group with the highest offense level and increasing that offense level by the amount indicated in the table in U.S.S.G. § 3D1.4. The highest offense level is 43, with 3½ total units and a corresponding four-level increase in the offense level, for a combined adjusted base offense level of 47.

### Role in the Offense

20.     The parties agree to recommend to the sentencing court that a 4-level increase be given for an aggravating role, under U.S.S.G. § 3B1.1(a), as the defendant was an organizer or leader of criminal activity that involved more than five participants by virtue of his being the president of the White Region of the Outlaw Motorcycle Club at material times and by virtue of his having overseen the commission of one or more of the eight racketeering acts, each of which he either personally committed or caused to be committed.

### Obstruction of Justice

21.     The parties agree to recommend to the sentencing court that a 2-level increase be given for obstruction of justice, under U.S.S.G. § 3C1.1, on the ground that the defendant willfully obstructed the administration of justice with respect to the investigation, prosecution, and sentencing of the instant offense by leaving the United States and being a fugitive from justice for approximately 15 years.

### Acceptance of Responsibility

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the

9

court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b).

## Sentencing Recommendations

23. The parties' agreement with respect to sentencing recommendation is set forth in paragraph 10 above.

## Court's Determinations at Sentencing

24. The parties acknowledge, understand, and agree that if the Court accepts the plea agreement, the Court will be bound by the joint sentencing recommendation of the parties under Federal Rule of Criminal Procedure 11(c)(1)(C). The parties acknowledge, understand, and agree that, under Federal Rule of Criminal Procedure 11(d)(2)(A), if after the Court accepts the plea, but before it imposes sentence, the Court rejects the plea agreement under Rule 11(c)(5), then, under Rule 11(d)(2)(A), the defendant may withdraw his plea of guilty.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any financial obligations.

## Special Assessment

26. The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing

## DEFENDANT'S WAIVER OF RIGHTS

27.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial is conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges that he has had the opportunity to have his attorney adequately explain these rights to him and the consequences of

11

his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

30.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

31.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

12

## GENERAL MATTERS

32.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

33.     The parties acknowledge, understand, and agree that if accepted by the Court, this plea agreement will be filed and become part of the public record in this case.

34.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

35.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

36.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed

13

against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

37.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

14

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.


Date: 3-24-16

RANDY M. YAGER
Defendant


I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.


Date: 03 24 16

STEPHEN P HURLEY.
Attorney for Randy M. Yager


For the United States of America:


Date: 3/24/16

GREGORY J. HAANSTAD
United States Attorney


Date: 3/24/16

CAROL L. KRAFT
SCOTT J. CAMPBELL
LAURA S. KWATERSKI
Assistant United States Attorneys

15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT-WI

2015 MAY 12 P 5:26

JON W. SANFILIPPO
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.                                            Case No. 97-CR-98

RANDY M. YAGER, aka "Mad,"

Defendant.

## SECOND SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

### Allegations common to all counts

1.     Except as otherwise indicated, at all times material to this indictment:

    a.     The American Outlaw Association, better known and hereinafter referred

to as the Outlaws Motorcycle Club ("OMC"), was an international

organization which engaged in, and the activities of which affected,

interstate and foreign commerce.

    b.     Within the United States, the Outlaws Motorcycle Club was composed of

individual chapters located in various cities throughout the country.  Each

chapter had a president, vice president, treasurer, and enforcer, as well as

general members.

Case 2:97-cr-00098-JPS-NJ   Filed 05/12/15   Page 1 of 16   Document 2101
Case 2:97-cr-00098-JPS   Filed 06/08/16   Page 16 of 31   Document 2170

**ATTACHMENT A**

c.    Outlaws Motorcycle Club chapters were grouped into color-coded geographic regions (White, Blue, Orange and Gray), each headed by a regional president or boss.  The regions and each of the chapters therein fell under the authority of the national president who, during the time period covered by this indictment, was Harry Bowman, aka "Taco."

d.    The White Region, sometimes referred to as the "Chicago Region," covered portions of the Midwest and included chapters located in Milwaukee, Wisconsin; Janesville, Wisconsin; LaCrosse, Wisconsin; Chicago, Illinois; Joliet, Illinois; Gary, Indiana; and for a time, Indianapolis, Indiana; and Peoria, Illinois.

e.    Membership in the Outlaws Motorcycle Club was limited to males and was the result of a controlled process that included a probationary period and ended with a vote by the full chapter membership.

f.    Members were expected to abide by a written code; to follow the directives of their chapter, regional and national bosses; to attend weekly chapter meetings, known as "church"; to pay dues; and to attend chapter, regional and national events, known as "runs."

g.    Violations of these expectations could result in fines, expulsion, another probationary period, or physical violence.

h.    The vestments, or "colors," of full club membership included a leather or denim vest with a back patch bearing the club emblem of skull with crossed pistons, surrounded by a top "rocker" with the word "Outlaws" and a bottom "rocker" identifying the member's chapter location.

2

## The Enterprise

2. The White Region of the Outlaws Motorcycle Club, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Sections 1961(4)(hereinafter the enterprise), that is a group of individuals associated in fact that was engaged in, and its activities affected, interstate commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3. At all times relevant to this indictment, **Randy M. Yager, aka "Mad,"** and others known and unknown, were leaders, members, and associates of the enterprise, which functioned as a criminal organization.

4. From approximately June 25, 1994, until approximately June 10, 1997, **Randy M. Yager, aka "Mad,"** acted as the president or boss of the White Region, and in that capacity, he directed and oversaw the racketeering acts alleged in this indictment, including activity in the Eastern District of Wisconsin.

## Objects and Purposes

5. It was an object and purpose of the enterprise:

   a. to protect and defend its Region, and to assist other Outlaws to protect and defend their Regions, that is, the geographical territory that the Outlaws Motorcycle Club leaders and members deemed to be within OMC control;

   b. to dictate and control the activities of other motorcycle clubs that existed within its Region; and

   c. to maintain the allegiance and loyalty of the OMC members, regardless of federal or state laws or social norms.

3

## Means and Methods

6.     To accomplish these and other objects and purposes of the enterprise, the defendant, **Randy M. Yager, aka "Mad,"** and others known and unknown, used the following means and methods, among others:

a.     Acts involving violence and intimidation, including assaults on the persons and property of rival biker gang members including members of the Hells Angels Motorcycle Clubs and other motorcycle clubs allied with the Hells Angels such as the Hells Henchmen and the Invaders. Such assaults included, but were not limited to, murder, arson, and causing damage by explosives.

b.     Acts involving violence and intimidation, including assaults on the persons and property of owners, managers, employees, and customers of businesses frequented by members of rival biker gangs, including the Hells Angels Motorcycle Club and other motorcycle clubs allied with the Hells Angels, such as the Hells Henchmen and the Invaders.

c.     Acts involving violence and intimidation, including assaults on persons who were members of the OMC's own organization who were perceived as disloyal to the enterprise or cooperating with law enforcement. Such assaults ranged from beatings that caused physical injury to murder.

4

## THE GRAND JURY FURTHER CHARGES:

## COUNT ONE

### The Racketeering Violation

7.      Between on or about January 1, 1990, the exact date unknown, and on or about June 10, 1997, in the Eastern District of Wisconsin and elsewhere, the defendant,

### RANDY M. YAGER, aka "Mad,"

and others, being persons employed by and associated with the enterprise, that is, the White Region of the Outlaws Motorcycle Club, as described above, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly, willfully, and unlawfully conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as those terms are defined in Title 18, United States Code, Section 1961(1) and (5), to wit: through the commission of Racketeering Acts 1 through 8, as set forth below.

### The Pattern of Racketeering

8.      The pattern of racketeering activity as defined in Title 18, United States Code, Section 1961(1) and (5) consisted of the following acts:

### Racketeering Act # 1

9.      On or about June 26, 1994, in Lake County, in the Northern District of Indiana and elsewhere,

### RANDY M. YAGER, aka "Mad,"

and other members and associates of the White Region of the Outlaws Motorcycle Club, including, but not limited to, members from the Milwaukee, Chicago, Wisconsin/Stateline, and Gary Outlaws chapters, committed an act involving murder, that is, knowingly and intentionally

5

combined, conspired, confederated and agreed among themselves and with others known and

unknown, to kill members of rival biker clubs, and in furtherance thereof, one or more of the

conspirators traveled to a speedway in Lake County, Indiana, while armed with dangerous

weapons, to confront members of rival biker clubs, in violation of Sections 35-42-1-1, 35-41-5-2,

and 35-41-2-4 of the Indiana Statutes.

**Racketeering Act # 2**

10.     On or about the dates set forth below, the defendant,

**RANDY M. YAGER, aka "Mad,"**

and other members and associates of the White Region of the Outlaws Motorcycle Club

committed the following acts involving arson, either of which alone constitutes the commission

of racketeering act #2:

> a.     Between on or about a date in July or August 1994, the exact date being
>
> unknown, and August 31, 1994, in the Northern District of Indiana and
>
> elsewhere, **Randy M. Yager, aka "Mad,"** and other members and
>
> associates of the White Region of the Outlaws Motorcycle Club
>
> knowingly and intentionally combined, conspired, confederated, and
>
> agreed among themselves and with others known and unknown, to
>
> knowingly and intentionally damage, by means of fire and destructive
>
> device, a dwelling belonging to the Hells Henchmen Motorcycle Club,
>
> under circumstances that endangered human life.  In furtherance thereof,
>
> one or more of the White Region Outlaws members outfitted a stolen car
>
> with a container of flammable fuel to be used as a torch, all in violation of

6

Sections 35-43-1-1(a)(1) & (2), 35-41-5-2 and 35-41-2-4 of the Indiana Statutes.

b.     On or about August 31, 1994, in the Northern District of Indiana and elsewhere, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, knowingly and intentionally damaged, by means of fire and destructive device, a dwelling belonging to the Hells Henchmen Motorcycle Club, under circumstances that endangered human life, in violation of Sections 35-43-1-1(a)(2) and 35-41-2-4 of the Indiana Statutes.

## Racketeering Act # 3

11.     On or about the dates set forth below, the defendant,

### RANDY M. YAGER, aka "Mad,"

and other members and associates of the White Region of the Outlaws Motorcycle Club, including but not limited to members from the Milwaukee, Chicago, Joliet, Wisconsin/Stateline and Gary Outlaws chapters, committed the following acts involving murder, either of which alone constitutes the commission of racketeering act #3:

a.     Between on or about September 20, 1994, the exact date being unknown, and on or about September 25, 1994, in the Western District of New York and elsewhere, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is, knowingly and intentionally combined, conspired, confederated and agreed with others known and unknown, to kill members of the Hells Angels Motorcycle

7

Club. In furtherance thereof, one or more of the conspirators did travel to Erie County, New York, while armed with dangerous weapons, to confront and kill members of the Hells Angels Motorcycle Club, in violation of Sections 125.25 and 105.15 of the Penal Laws of the State of New York.

    b.    On or about September 25, 1994, in the Western District of New York and elsewhere, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is under circumstances evincing a depraved indifference to human life, engaged in conduct which created a grave risk of death to Michael Quale, and thereby caused the death of Michael Quale, in violation of Sections 125.25(2) and 20.00 of the Penal Statutes of New York.

## Racketeering Act #4

12.    On or about the dates set forth below, the defendant,

### RANDY M. YAGER, aka "Mad,"

and other members and associates of the White Region of the Outlaws Motorcycle Club, including, but not limited to members from the Milwaukee, Chicago, and Wisconsin/Stateline Outlaws chapters, committed the following acts involving murder and arson, any of which alone constitutes the commission of racketeering act #4:

    a.    Between on or about a date in September, 1994, the exact date being unknown, and on or about October 12, 1994, in Winnebago County in the Northern District of Illinois, the defendant, **Randy M. Yager, aka**

8

"**Mad,**" and other members of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is, knowingly and intentionally combined, conspired, confederated and agreed with each other and others, known and unknown, to kill, without lawful justification, Roger Fiebrantz. In furtherance thereof, one or more of the conspirators placed an explosive device on a vehicle owned and operated by Roger Fiebrantz, in violation of Chapter 720, Sections 5/9-1(a)(1), 5/8-2(a) and 5/5-1 of the Illinois Statutes.

b.     Between on or about a date in September, 1994, the exact date being unknown, and on or about October 12, 1994, in Winnebago County in the Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is, without lawful justification, knowingly and intentionally attempted to kill Roger Fiebrantz, a human being, in violation of Chapter 720, Sections 5/9-1(a)(1), 5/8-4(a), and 5/5-1 of the Illinois Statutes.

c.     On or about October 12, 1994, in Winnebago County in the Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the Outlaws Motorcycle Club, committed an act involving arson, that is by means of an explosive, knowingly damaged, without consent, personal property having a value of $150.00 or more, in violation of Chapter 720, Sections 5/20-1(a) and 5/5-1 of the Illinois Statutes.

9

## Racketeering Act # 5

13.     On or about the dates set forth below, the defendant,

**RANDY M. YAGER, aka "Mad,"**

and other members of the White Region of the Outlaws Motorcycle Club, including members from the Milwaukee, Chicago, and Wisconsin/Stateline Chapters, committed the following acts involving murder and arson, any one of which alone constitutes racketeering act # 5:

a.     Between on or about a date in approximately August or September 1994, the exact date being unknown and on or about November 7, 1994, in Winnebago County, in the Northern District of Illinois, **Randy M. Yager, aka "Mad,"** and other members and associates of the Outlaws Motorcycle Club, did commit an act involving murder, that is, knowingly and intentionally combined, conspired, confederated and agreed among themselves and with others known and unknown, to kill, without lawful justification, Michael Coyne, and in furtherance thereof, one or more of the conspirators placed an explosive device in a vehicle owned and operated by Michael Coyne, in violation of Chapter 720, Sections 5/9-1(a), 5/8-2(a) and 5/5-1 of the Illinois Statutes.

b.     Between a date in approximately August or September 1994, the exact date being unknown, and approximately November 7, 1994, in Winnebago County, in the Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the Outlaws Motorcycle Club, committed an act involving murder, that is, without lawful justification, knowingly and intentionally attempted to kill Michael

10

Coyne, a human being, in violation of Chapter 720, Sections 5/9-1(a), 5/8-4(a) and 5/5-1 of the Illinois Statutes.

c.     On or about November 7, 1994 in Winnebago County, in the Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and others, did commit an act involving arson, that is by means of an explosive, did knowingly damage, without consent, personal property having a value of $150.00 or more, in violation of Chapter 720, Sections 5/20-1(a) and 5/5-1 of the Illinois Statutes.

### Racketeering Act # 6

14.     On or about the dates set forth below, the defendant,

**RANDY M. YAGER, aka "Mad,"**

and other members of the White Region of the Outlaws Motorcycle Club, including members of the Milwaukee, Chicago, Gary and Wisconsin/Stateline chapters, committed the following acts involving murder and arson, any one of which alone constitutes racketeering act # 6:

a.     Between a date in approximately August or September 1994, the exact date being unknown, and on or about November 7, 1994, in Cook County, in the Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club committed an act involving murder, that is, they knowingly and intentionally combined, conspired, confederated, and agreed among themselves and with others known and unknown to commit murder, and in furtherance thereof, one or more of the conspirators did place and detonate an explosive device, adjacent to the Hells Henchmen

11

clubhouse, in violation of Chapter 720, Sections 5/9-1, 5/8-2(a) and 5/5-1 of the Illinois Statutes.

b. On or about November 7, 1994, in Cook County, Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the Outlaw Motorcycle Club, committed an act involving arson, that is by means of an explosive, knowingly damaged, without consent, real property, in violation of Chapter 720, Sections 5/20-1(a) and 5/5-1 of the Illinois Statutes.

### Racketeering Act #7

15. On or about the date set forth below,

### RANDY M. YAGER, aka "Mad,"

and other members and associates of the White Region of the Outlaws Motorcycle Club, committed the following acts involving murder, any one of which alone constitutes racketeering act # 7:

a. On or about January 28, 1995, in the Northern District of Indiana, and elsewhere, the defendant **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is, knowingly and intentionally combined, conspired, confederated, and agreed among themselves and with others to knowingly and intentionally kill Donald Fogg, and in furtherance thereof, one or more conspirators lured Donald Fogg to an isolated location, in violation of Sections 35-42-1-1, 35-41-5-2, and 35-41-2-4 of the Indiana Statutes.

12

b.  On or about January 28, 1995, in the Northern District of Indiana, the defendant, **Randy M. Yager, aka "Mad,"** and other members of the White Region of the Outlaws Motorcycle Club, committed an act involving murder, that is knowingly and intentionally killed Donald Fogg, in violation of Sections 35-42-1-1 and 35-41-2-4 of the Indiana Statutes. The murder was committed after the defendant, **Randy M. Yager, aka "Mad,"** had committed another murder.

### Racketeering Act # 8

16.  On or about the dates set forth below, the defendant,

**RANDY M. YAGER, aka "Mad,"**

and other members and associates of the White Region of the Outlaws Motorcycle Club, including members of the Chicago, Joliet, and Wisconsin/Stateline chapters, committed the following acts involving murder, any one of which alone constitutes racketeering act # 8:

a.  Between on or about a date in January 1995, the exact date being unknown, and on or about March 6, 1995, in Cook County, Northern District of Illinois, the defendant **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, intentionally combined, conspired, confederated, and agreed among themselves, and with others known and unknown, to kill, without lawful justification, members of a rival biker gang, and in furtherance thereof, one or more of said conspirators did conduct surveillance on the activities of Jack Castle in preparation for the intended

13

killing, in violation of Chapter 720, Sections 5/9-1(a), 5/8-2(a) ad 5/5-1 of the Illinois Statutes.

b.    On or about March 3, 1995, in Cook County, Northern District of Illinois, the defendant, **Randy M. Yager, aka "Mad,"** and other members and associates of the White Region of the Outlaws Motorcycle Club, without lawful justification, knowingly and intentionally killed Jack Castle, a human being, in violation of Chapter 720, Sections 5/9-1(a) and 5/5-1 of the Illinois Statutes. The murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme and design to take human life by unlawful means and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom.

All in violation of Title 18, United States Code, Section 1962(c).

14

**THE GRAND JURY FURTHER CHARGES:**

## COUNT TWO

### The Racketeering Conspiracy

17.  The allegations set forth in Count One of this indictment are realleged and incorporated by reference as if fully set forth herein.

18.  Between on or about January 1, 1990, the exact date being unknown, and on or about June 10, 1997, in the Eastern District of Wisconsin and elsewhere, the defendant,

**RANDY M. YAGER, aka "Mad,"**

and others, being persons employed by and associated with the enterprise described in paragraphs 1 and 2 above, that is, the White Region of the Outlaws Motorcycle Club, knowingly, willfully and unlawfully combined, conspired, confederated, and agreed among themselves and with others known and unknown, to commit an offense against the United States, to wit:  to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, which was engaged in, and the activities of which, affected interstate commerce, through a pattern of racketeering activity, as those terms are defined in Title 18, United States Code, Section 1961(1) and (5).

19.  The pattern of racketeering activity through which the defendant agreed to conduct the affairs of the enterprise consisted of the acts set forth in Count One of this indictment, which are realleged and incorporated by reference as if fully set forth herein.

20.  It was further part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

15

A TRUE BILL:

_____
FOREPERSON

5-12-2015
_____
DATE

James L. Santelle
_____
JAMES L. SANTELLE
United States Attorney

16