UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
                          *Plaintiff,*

**NOTICE OF MOTION FOR ORDER REDUCING SENTENCE OR MODIFYING JUDGMENT**

Case No.: 2:97-cr-00098-6

RANDY M. YAGER,
                          *Defendant.*

S I R S :

        PLEASE TAKE NOTICE, that upon the annexed memorandum of law, the undersigned move this Court pursuant to Title 18 USC §3582(c)(1)(A) for defendant Randy M. Yager's immediate release from the United States Bureau of Prisons Custody at FCI Milan together with such other and further relief as to this Court may seem just and proper.

DATED:    Buffalo, New York
                August 31, 2020

                                          Respectfully submitted,

                                          /s/Alexander E. Basinski

                                          ALEXANDER E. BASINSKI, ESQ.
                                          ERIN MCCAMPBELL PARIS, ESQ.
                                          LIPSITZ GREEN SCIME & CAMBRIA LLP
                                          Attorneys for Defendant
                                          Randy M. Yager
                                          Office and Post Office Address
                                          42 Delaware Avenue – Suite 300
                                          Buffalo, New York 14202
                                          (716) 849-1333

TO:    CAROL L. KRAFT, ESQ.
          ASSISTANT UNITED STATES ATTORNEY
          517 E Wisconsin Avenue – Room 530
          Milwaukee, WI 53202

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
      *Plaintiff,*

**DECLARATION OF ALEXANDER E. BASINSKI, ESQ. IN SUPPORT OF MOTION FOR ORDER REDUCING SENTENCE OR MODIFYING JUDGMENT**

Case No.: 2:97-cr-00098-6

RANDY M. YAGER,
      *Defendant.*

ALEXANDER E. BASINSKI, ESQ., being an attorney admitted to practice law in this District, and subject to the penalties of perjury, does hereby declare the following to be true and correct:

1. I, along with Erin McCampbell Paris, Esq., represent the defendant, RANDY M. YAGER ("Mr. Yager" or "Defendant").

2. I hereby file this declaration in support of Mr. Yager's Motion for Order Reducing Sentence or Modifying Judgment ("Motion").

## BACKGROUND

3. On May 30, 1997, Mr. Yager was indicted under the above captioned indictment number in the Eastern District of Wisconsin.

4. On November 18, 2014, Mr. Yager was arraigned and pleaded not guilty. (*See* Minute Entry, Dkt. No. 2070.) He was detained pending trial. (*See id*.)

5. On March 24, 2016, Mr. Yager pleaded guilty to Racketeering in violation of 18 U.S.C. § 1962(c), and Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). (*See* Minute Entry, Dkt. No. 2164.)

6. On July 26, 2016, Mr. Yager was sentenced to concurrent 180-month terms of imprisonment on each of Counts One and Two and concurrent five-year periods of supervised release on each of Counts One and Two. (*See* Dkt. Nos. 2182, 2184.)

7. Mr. Yager, who has been incarcerated since his arraignment on November 18, 2014, is presently incarcerated at FCI Milan in Milan, Michigan. His term of imprisonment is set to expire on July 27, 2027.

8. Mr. Yager suffers from numerous chronic or serious medical conditions, including hypertension, old myocardial infarction, aortic aneurysm (without rupture), psoriasis, follicular disorder, spinal stenosis, muscle weakness, enlarged prostate, a shoulder and upper arm injury, and unspecified abnormalities of gait and mobility. The advent of the spread of the novel coronavirus that causes the illness COVID-19 which has spread rapidly across the world and throughout the United States warrants consideration when determining whether Mr. Yager's sentence should be modified or reduced, or whether Mr. Yager should be permitted to serve the remainder of his sentence under home confinement.

9. On March 11, 2020, the World Health Organization ("WHO") designated the COVID-19 outbreak a global pandemic.[1] On March 13, 2020, the President of the United States declared a national state of emergency.[2] As the virus ravished this country, more than half of the

---

[1] *WHO Characterizes COVID-19 as a Pandemic,* World Health Organization, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020, (March 11, 2020).
[2] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/, (March 13, 2020)

states issued stay-at-home/shelter-in-place orders and those that did not or those that reopened early continue to have rampant community spread of the virus.

10. To stem the spread of the disease, the Center of Disease Control and Prevention ("CDC") has broadly advised people to take basic preventative actions, such as avoiding crowds, staying six feet away from one another, disinfecting frequently used surfaces, and frequently washing hands or using sanitizer.[3] The seriousness of the crisis need not be belabored here as this Court is well aware of our nation's current situation.

11. Critically, public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in protective measures to keep themselves safe."[4] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[5] Prior to March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in social, legal and medical visits in the community at a time when the novel coronavirus already began to spread.[6] On April 1, 2020, the BOP implemented lockdowns that lasted over a month.[7] The lockdowns have since been lifted, but the risk of the spread of the virus in prison facilities remains. Still, to this day, inmates must share communal living spaces, such as cells, recreation rooms, dining halls, and exercise yards. Outbreaks continue at prisons across the nation.

---

[3] *How to Protect Yourself & Others,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html, (last accessed August 26, 2020).
[4] *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States,* https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf, (March 13, 2020)
[5] *Id.*
[6] *Federal Bureau of Prisons COVID-19 Action Plan,* https://www.bop.gov/resouces/news/20200313_covid-19.jsp, (March 13, 2020).
[7] *COVID-19 Action Plan: Phase Five,* https://www.bop.gov/resouces/news/20200331_covid19_action_plan_5.jsp, (March 31, 2020).

12. Recognizing the risk of spread within prisons, Attorney General William Barr enacted emergency authority under the CARES Act to further facilitate compassionate release to home confinement.[8] Given the surge in positive cases at select sites, the BOP began immediately reviewing all inmates who had COVID-19 risk factors to determine which inmates are suitable for home confinement.[9]

13. Since that time, the total number of COVID-19 cases has steadily risen throughout the world. As of August 24, 2020, COVID-19 has resulted in a cumulative total of over 23 million cases and 800,000 deaths worldwide.[10]

14. As of August 27, 2020, the United States has reported 5,752,653 cases including 178,998 deaths.[11] Indeed, 1,142 new COVID-19 deaths were reported on August 25, 2020, and 1,239 new COVID-19 deaths were reported on August 26, 2020.[12].

15. The Bureau of Prisons ("BOP") has seen a significantly greater rate of infection than the general population of the United States. Indeed, the BOP has approximately 76.98 infections per one thousand people, while the United States has seen only 15.34 infections per one thousand people.[13]

16. As of August 26, 2020, FCI Milan reports two active cases; one inmate and one staff member.[14]

---

[8] https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf (last visited Apr. 21, 2020).
[9] https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 21, 2020).
[10] *Weekly Epidemiological Update*, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200824-weekly-epi-update.pdf?sfvrsn=806986d1_4, WHO (last visited August 26, 2020).
[11] *Cases in the US*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, CDC (last visited August 27, 2020).
[12] *Id.*
[13] *BOP-Reported Positive Tests for COVID-19 Nationwide*, https://federaldefendersny.org/, (last visited August 26, 2020).
[14] *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/, BOP (last visited August 26, 2020).

# ARGUMENT

17. Due to Mr. Yager's medical condition and the risks that are involved if he were to contract the virus, we respectfully ask that this Court issue an order reducing Mr. Yager's sentence to time served under 18 U.S.C. § 3582(c)(1)(A); or, in the alternative, issue an order permitting Mr. Yager to serve the remainder of his sentence in home confinement.

18. Furthermore, Mr. Yager has fully exhausted his administrative remedies and his Motion is properly before this Court.

## I.     Legal Standard For Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)

19. Generally, a district court judge may not modify a term of imprisonment except pursuant to 18 U.S.C. § 3582(c)(1)(A). If the statute is satisfied, however, a district court judge may reduce a prison sentence to a sentence of time served and impose home detention or incarceration as a condition of supervised release. The compassionate release framework under 18 U.S.C. § 3582(c)(1)(A), as amended by the previously passed First Step Act, provides as follows:

> The court may not modify a term of imprisonment once it has been imposed except that . . . in an case . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal, a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction[.]

20. Therefore, as will be seen below, Mr. Yager's application meets the requirements of § 3582(c)(1)(A) because Mr. Yager's administrative remedies have been exhausted, extraordinary and compelling reasons warrant the reduction of the prison sentence; the factors set forth in 18 U.S.C. § 3553(a) support modification of the prison term, and a reduction in the prison sentence is consistent with the Sentencing Commission's policy statements.

        **a.    Mr. Yager has satisfied the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A)**

21. On June 23, 2020, Mr. Yager submitted a request to FCI Milan administration requesting a reduction in sentence based upon the COVID-19 pandemic and his severe underlying health conditions. *See* June 23, 2020 Email to FCI Milan Administration, attached hereto as **Exhibit A**.

22. To date, Mr. Yager has received no response from FCI Milan administration regarding the request to modify his sentence.

23. Due to the "failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request," Mr. Yager has satisfied the administrative exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A).

24. Consequently, this Court has the authority to hear Mr. Yager's Motion.

**II.    The COVID-19 Pandemic, Which Poses Particular Dangers to Medically Vulnerable Inmates Like Randy Yager, Presents "Extraordinary and Compelling Reasons" Which Justify Compassionate Release.**

25. In the months since the WHO declared a global pandemic, COVID-19 has continued to spread at an alarming rate. Incarcerated individuals are at special risk of infection and are less able to participate in proactive measures, such as social distancing, to keep themselves safe. The conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread rapidly. The virus has been shown to spread through aerosol particles which are released

through speaking, yelling, or singing.[15] and because symptoms may not present themselves for up to fourteen days, a single person can infect others for weeks before becoming sick.[16]

### a. Mr. Yager's medical condition

26. Although 18 U.S.C. § 3582(c) does not define "extraordinary and compelling reasons," this Court has found that relevant commentary and policy statements promulgated by the Sentencing Commission may assist in making a Court's determination. *See United States v. Gonzalez*, 2020 WL 4437154 at *3 (E.D. Wis. Aug. 3, 2020).

27. Indeed, this Court has recognized that the commentary to U.S.S.G. § 1B1.13 is instructive with respect to a defendant's medical condition. *See id*. Guideline § 1B1.13 states that extraordinary and compelling reasons exist when the defendant is:

> [S]uffering from a serious physical or medical condition . . . or experiencing deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. (quoting Commentary to U.S.S.G. § 1B1.13.)

28. In *Gonzalez*, this Court held that the defendant's medical conditions constituted "extraordinary and compelling reasons" to reduce his sentence under subdivisions (A) through (D) of comment 1 to U.S.S.G. § 1B1.13. *See id*. at *4. The defendant suffered from several chronic conditions which increased his risk of infection and severe illness from COVID-19. *See id*. at *2. Critically, this Court recognized that "prison is a particularly dangerous place for Defendant at this moment. Prisons are difficult places, even with the measures being taken by the BOP, in which to

---

[15] *High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice*, https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e6.htm, CDC (last visited Aug. 26, 2020).
[16] *Watch for Symptoms,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html, (last accessed August 26, 2020).

prevent the spread of the virus and adequately quarantine prisoners." *Id*. at *4. Based upon these findings, this Court granted the defendant's (unopposed) motion for compassionate release.

29. In *United States v. Cunningham*, 2020 WL 436811 (E.D. Wis. Jul. 29, 2020), this Court recognized that a defendant's medical conditions may present extraordinary and compelling reasons warranting release. *See id*. at *2. The defendant suffered from obesity, Meniere's disease (a disorder of the inner ear), stage III kidney disease, anemia, sleep apnea, and several skin conditions. *See id*. at *1. This Court recognized that in light of the CDC's guidance for persons at increased risk, that the defendant established extraordinary and compelling reasons for release. *See id*. at *3. As a result, this Court granted the defendant's motion. *See id*. at *4.

30. Similarly, in *United States v. Anderson*, 2020 WL 4339220 (E.D. Wis. Jul. 29, 2020), this Court found that a defendant's medical conditions presented extraordinary and compelling reasons for release. *See id*. at *4. The government opposed release, stating that the defendant was not currently at risk because he was not infected, and there were no reported cases in the inmate population where the defendant was being held. *See id*. at *2. Critically, this Court recognized that "[a]lthough Defendant currently does not have COVID-19, if he were to contract COVID-19, the consequences would likely be dire. Courts have recognized that an inmate's high-risk medical conditions may warrant compassionate release due to the pandemic even when there are no reported cases at their institution at the moment. *Id*. (collecting cases).

31. Other courts, when granting compassionate release, have also criticized the BOP's response to the COVID-19 crisis. See *United States v. Hammond*, 2020 WL 1891980 at *9 (D.D.C., Apr. 16, 2020) (Responding to the government's argument that "BOP is prepared to deal with pandemics such as the Coronavirus" by noting the hundreds of positive cases and 16 inmate deaths which resulted "[d]espite the precautions taken by BOP"), *United States v. Scparta*, 2020

WL 1910481 at *1 (S.D.N.Y. Apr. 20, 2020) (criticizing the BOP's inadequate quarantine measures which placed the defendant in "conditions that will inevitably permit the virus to spread").

32. Here, based upon relevant CDC guidelines, Mr. Yager's medical conditions place him at increased risk of severe illness. His medical conditions also severely limit his ability to care for himself in the environment of a correctional facility, further increasing his risk.

33. On March 20, 2019, Mr. Yager was evaluated by BOP Health Services. *See* BOP Medical Records, attached hereto as **Exhibit B** (filed under seal). The records indicate that Mr. Yager has a history of "Gadolinium poisoning that resulted in neuropathy. Has had two separate surgeries for decompression of the thoracic and lumbar spine. Was w/c bound until a few months ago, is able to use a walker . . .He is also unable to move walker into shower." *Id*. at 1 (filed under seal).

34. Upon information and belief, Mr. Yager was given an injection of gadolinium dye as part of a routine CAT-scan performed by the BOP in December of 2016. *See id*. at 5 (filed under seal). Mr. Yager experienced gadolinium poisoning as a result of the injection, which resulted in neuropathy. *See id*. (filed under seal).

35. In early 2017, Mr. Yager began experiencing numbness in his legs that resulted in chronic ambulatory issues. *See id*. at 39 (filed under seal). It is believed that the condition was caused by Mr. Yager's underlying spinal stenosis. *See id*. at 23 (filed under seal). Despite treatment by the BOP, Mr. Yager's ambulatory condition has not improved. *See id*. at 1 (filed under seal). Indeed, Mr. Yager was wheelchair bound as recently as early 2019 and requires assistance with daily personal hygiene including showering. *See id*. (filed under seal).

36. Furthermore, the records state that Mr. Yager's "gait is unstable. He shifts weight from right to left when standing using objects to balance. Gait is slow, wide, and unsteady and 'dragging'. Strength in quadriceps bilaterally 3/5." *Id*. at 1 (filed under seal). Mr. Yager was found to have muscle weakness, spinal stenosis, and unspecified abnormalities of gait and mobility. *See id*. (filed under seal).

37. Additionally, Mr. Yager's BOP records reveal numerous chronic or serious medical conditions, including hypertension, old myocardial infarction, aortic aneurysm (without rupture), constipation, psoriasis, follicular disorder, spinal stenosis, muscle weakness, enlarged prostate, a shoulder and upper arm injury, and unspecified abnormalities of gait and mobility. *See id*. at 3-4 (filed under seal).

38. In the past, Mr. Yager has also suffered from MRSA infections, chronic ischemic heart disease, and open wounds on his lower back. *See id*. at 4 (filed under seal).

39. Mr. Yager has suffered from deteriorating mobility since at least 2017. *See id*. at 29 (filed under seal). On February 27, 2017, Mr. Yager reported an inability to walk after previously indicating numbness in the legs. *See id*. at 29-31 (filed under seal). Plainly, these conditions have not improved with the passage of time and BOP medical treatment.

40. Due to his limited mobility, Mr. Yager is allowed extra time to travel to and from the chow hall for lunch and dinner. *See id*. at 43 (filed under seal). Upon information and belief, Mr. Yager now remains in his unit while food is brought to him.

41. Upon information and belief, Mr. Yager is 5'11" and weighs 260 pounds. According to the National Heart, Lung and Blood Institute, Mr. Yager's body mass index of 36.3 places him in the "obese" category.[17]

---

[17] *Calculate Your Body Mass Index*, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm, NIH (last visited August 26, 2020).

42. The CDC has identified several medical conditions which place people of any age at increased risk of severe illness from COVID-19, including serious heart conditions, obesity and hypertension.[18] As noted above, Mr. Yager currently suffers from obesity, hypertension and aortic aneurysm, and has suffered from chronic ischemic heart disease in the past. These conditions, alone, place him at increased risk of severe illness from COVID-19, but he has several other chronic or serious medical conditions and issues.

43. Furthermore, Mr. Yager's chronic ambulatory issues increase his risk of COVID-19 infection due to his inability to care for himself in the environment of a correctional facility. As noted above, Mr. Yager's medical records indicate that he uses a walker, but is unable to move the walker into the shower. He also suffers from obesity and various skin conditions, which indicate an inability to exercise or maintain adequate levels of personal hygiene while incarcerated at FCI Milan.

44. Mr. Yager's experience with ineffective medical treatment by the BOP has left him particularly concerned for his health and safety during the COVID-19 pandemic. Indeed, Mr. Yager was *poisoned* during a routine CAT-scan while under the care of the BOP. *See id*. at 5 (filed under seal).

45. Even assuming that Mr. Yager would receive the same level of treatment by BOP medical staff as he would through a private physician, it is far more likely that Mr. Yager will become infected if he remains in a BOP facility. In particular, his limited mobility makes it difficult for Mr. Yager to properly social distance and maintain adequate personal hygiene while incarcerated.

---

[18] *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, CDC (last visited August 26, 2020).

46. As of August 26, 2020, there are two active COVID-19 cases at FCI Milan, indicating that the virus can infiltrate the facility despite BOP precautions. Should Mr. Yager become infected, the consequences would be dire. Mr. Yager's sentence should not be turned into a death sentence.

47. We respectfully submit that Mr. Yager's medical conditions present "extraordinary and compelling reasons" for a reduction of his sentence.

> **b.     The relevant § 3553(a) sentencing factors warrant reduction or modification of Mr. Yager's sentence.**

48. When a defendant establishes the existence of extraordinary and compelling circumstances justifying relief under 18 U.S.C. § 3582(c)(1)(A), a court must consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. *See* 18 U.S.C. § 3582(c)(1)(A). Here, Mr. Yager's medical conditions and the unique dangers of contracting COVID-19, when coupled with the Sentencing Guidelines and other § 3553(a) sentencing factors, warrant relief.

49. Mr. Yager is 64 years old. He was sentenced to a term of 180 months with a five year term of supervised release. Mr. Yager's current release date is July 27, 2027. He has been incarcerated for nearly six years, since his arraignment on November 18, 2014.

50. During his period of incarceration – despite his physical limitations – Mr. Yager has completed numerous educational and vocational programs. *See* March 1, 2020 Individualized Reentry Plan – Program Review, attached hereto as **Exhibit C**.

51. Mr. Yager's "Male Pattern Risk Scoring" analysis, conducted by the BOP on May 31, 2020, classified Mr. Yager's risk level as "minimum." *See* May 31, 2020 Male Pattern Risk Score, attached hereto as **Exhibit D**.

52. Mr. Yager was originally charged on May 30, 1997 in an Indictment outlining offenses which took place between January 1, 1988 and May 30, 1997. (*See* Indictment, Dkt. No. 1 at 15-16.) Prior to sentencing, Mr. Yager's counsel, Stephen Hurley, wrote to Your Honor:

> While having fled prosecution is not a favored act, in the almost 20 years of his absence he lived a law-abiding life. The Randy Yager who you will sentence is not the same Randy Yager who fled . . . [i]ncapacitation to prevent future crime is not, today, the same concern it would have been 20 years ago. It will be even less 11 years hence. He has demonstrated that he can live productively, peacefully and within the law.

*See* July 25, 2016 Letter to Honorable Joseph P. Stadtmueller, attached hereto as **Exhibit E**.

53. Mr. Hurley's words are even more meaningful four years later, particularly in light of Mr. Yager's ambulatory and other medical conditions.

54. If released, Mr. Yager would reside with a friend, Lela Wislocka at 2046 W. Iowa Street in Chicago, Illinois 60622.

55. Based upon Mr. Yager's age, dedication to education while incarcerated, his minimal risk level, and severe medical conditions, we respectfully submit that the § 3553(a) factors weigh heavily in favor of release.

## CONCLUSION

In light of the foregoing, we ask the Court to grant Mr. Yager's request for Compassionate Release. We understand that Mr. Yager has approximately seven years remaining on his sentence, and has already served approximately five years and nine months of his term of incarceration. Mr. Yager suffers from several medical conditions which place him at increased risk of severe illness from COVID-19. Furthermore, Mr. Yager's ambulatory issues prevent him from properly caring for himself in FCI Milan, which currently has two active COVID-19 cases. Given his medical condition and the BOP's inability to control the pandemic in its facilities, we respectfully ask this Court to reduce Mr. Yager's sentence to time served, or, in the alternative, allow him to serve the

remainder of his sentence under home confinement. Mr. Yager, with the permission of the United States Probation Department, would reside and/or serve the remainder of his sentence at 2046 W. Iowa Street in Chicago, Illinois 60622. Being released to his home will permit Mr. Yager to obtain medical help from his own private physician.

We believe that releasing Mr. Yager under 18 U.S.C. § 3582(c)(1)(A) will reduce his chances of contracting COVID-19, which would likely transform Mr. Yager's sentence of incarceration into a death sentence. We respectfully request that this Court order Mr. Yager's immediate release, or, in the alternative, allow Mr. Yager to serve the remainder of his sentence on home incarceration.

DATED:   Buffalo, New York
         August 31, 2020

Respectfully submitted,

/s/Alexander E. Basinski
_____
ALEXANDER E. BASINSKI, ESQ.
ERIN MCCAMPBELL PARIS, ESQ.
LIPSITZ GREEN SCIME & CAMBRIA LLP
Attorneys for Defendant
RANDY M. YAGER
Office and Post Office Address
42 Delaware Avenue – Suite 300
Buffalo, New York 14202
(716) 849-1333

TO:   CAROL L. KRAFT, ESQ.
      ASSISTANT UNITED STATES ATTORNEY
      517 E Wisconsin Avenue – Room 530
      Milwaukee, WI 53202