UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                       Case No. 97-CR-98

RANDY M. YAGER,

        Defendant.

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582 (c) (1) (A)

The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Assistant United States Attorney, hereby responds to the defendant's motion for compassionate release, filed pursuant to 18 U.S.C. § 3582 (c) (1) (A). For the reasons set forth herein, the motion should be denied.

## INTRODUCTION

Randy M. Yager is serving a total sentence of 180 months (15 years) in federal prison after pleading guilty to Conducting the Affairs of an Enterprise, the Outlaw Motorcycle Club, through a Pattern of Racketeering (RICO), in violation of 18 U.S.C. § 1962 (c); and Conspiracy to Conduct the Affairs of an Enterprise, the Outlaw Motorcycle Club, through a Pattern of Racketeering (RICO conspiracy), in violation of 18 U.S.C. § 1962 (d).

Yager was originally charged on May 30, 1997, along with sixteen other Outlaw members. Dkt. 1. On June 2, 1997, a warrant was issued for his arrest. Dkt. 2066. Yager was a fugitive until October 16, 2014, when he was arrested in Rosarito, Baja California Norte, Mexico, formally deported to the United States, and transferred to the Eastern District of Wisconsin. Dkt. 2067.

1

During his absence, the grand jury returned a Superseding Indictment as to all seventeen defendants, including Yager. The new indictment contained the same charges as to Yager. He was arraigned on that indictment on November 14, 2014. Dkt. 2070. On May 12, 2015, the grand jury returned a Second Superseding Indictment as to Yager.[1] Dkt. 2101. The Second Superseding Indictment again alleged Racketeering and Racketeering Conspiracy counts, but increased the underlying racketeering predicate acts attributable to Yager from two to eight.[2] He was arraigned on the Second Superseding Indictment on May 22, 2015. Dkt. 2105.

On March 24, 2016, the parties signed a plea agreement pursuant to Fed. R. Crim. P. 11 (c) (1) (C). That agreement jointly recommended that the Court impose a total sentence of 15 years. Dkt. 2170. On May 6, 2016, the Court ordered a Presentence Report ("PSR"). Dkt. 2169. The final revised PSR was filed on July 25, 2016. Dkt. 2179. On July 26, 2016, after receipt of the PSR, a sentencing memorandum by Yager, and various additional items, the Court accepted the plea agreement. Yager pled guilty to the indictment, and the Court sentenced him to 180 months on each count, concurrent, for a total of 180 months; five years of supervised release on each count, concurrent, for a total of five years supervised release; and a $100 special assessment on each count, for a total assessment of $200. Dkt. 2182, 2184.

Yager is presently incarcerated at Milan Federal Correctional Institution ("FCI"), a low security prison, with an inmate population of 1600, located in York Township, Michigan. Yager has served approximately 6 years of his sentence. According to prison records, he has a projected release date of November 9, 2027.

---

[1] In the intervening years, all sixteen of Yager's original co-defendants had been convicted, either by plea or at trial.
[2] The additional racketeering offenses occurred before Yager's fugitive flight which tolled the Statute of Limitations under 18 U.S.C. § 3290.

2

On August 31, 2020, Yager filed this motion for compassionate release, pursuant to 18 U.S.C. § 3582 (c) (1) (A). He contends that he suffers from numerous chronic or serious medical conditions including hypertension, old myocardial infarction, aortic aneurysm without rupture, psoriasis, follicular disorder, spinal stenosis, muscle weakness, enlarged prostate, shoulder and upper arm injury, and unspecified abnormalities of gait and mobility. Given those health issues, and in light of prevalence of the novel coronavirus, which causes COVID-19, he argues that his sentence should be modified or reduced, or in the alternative, that he should be permitted to serve the remainder of his sentence under home confinement. For the reasons set forth below, the Court should deny Yager's motion for sentence relief.

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582 (c) (1) (A), as amended on December 21, 2018 by the First Step Act of 2018, Pub. L. No. 115-391, § 603 (b), 132 Stat. 5194, 5239, a court may grant a defendant's own motion for a reduction in his sentence, filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553 (a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582 (c) (1) (A). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

Case 2:97-cr-00098-JPS   Filed 09/22/20   Page 3 of 23   Document 2229

The Sentencing Commission's policy statement addressing reduction of sentences under § 3582 (c) (1) (A), provides that a court may reduce the term of imprisonment after considering the § 3553 (a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142 (g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[3]

An application note to the policy statement specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1 (A) (i). Second, the standard is met if the defendant is: (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. USSG § 1B1.13, cmt. n.1 (A) (ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances, none of which apply to Yager. USSG § 1B1.13, cmt. n.1 (B)-(C). Finally, the note recognizes the possibility that the Bureau of Prisons ("BOP") could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1 (D).

---

[3] The policy statement refers only to motions filed by the BOP Director. This is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582 (c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603 (b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582 (c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement should apply to motions filed by defendants as well.

4

Under the plain language of the statute, it appears that Yager has standing to bring this motion to the Court because he made a request to the Warden on June 23, 2020, and more than 30 days have elapsed since the date of that motion. See Def. Motion, Exhibit A, Dkt. 2222-1. BOP staff have confirmed this request and further noted that the Warden's response is "pending." The motion, however, should be denied on the merits.

## ARGUMENT

**I.     The Court Should Deny Yager's Motion Because He Has Failed to Establish "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because He Has Not Demonstrated that He Warrants Early Release Based on the § 3553 Sentencing Factors.**

### A.     Yager Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

Yager's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As noted above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c) (1) (A) (i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1 (A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1 (A).  If a defendant's medical condition

5

does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

Here, Yager first contends that the COVID-19 pandemic itself presents extraordinary and compelling reasons that justify compassionate release. See Def. Br. at 7. In support, he argues that incarcerated individuals are at special risk of infection as the result of the conditions at BOP facilities. *Id*. The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, however, does not fall into any recognized medical category and therefore cannot alone provide a basis for a sentence reduction. The recognized categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United State v. Raia*, __F.3d__, 2020 WL 1647922, at *2 (3rd Cir. April 2, 2020).; *see also United States v. Eberhart*, 2020 WL 1450745 at *2 (N.D. Calif. March 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by§ 3582(c) (1) (A).").[4] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine

---

[4] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

6

individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c) (1) (A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Yager further argues that he has numerous chronic and serious medical conditions and that the spread of the coronavirus causing COVID-19 "warrant consideration" when determining whether his sentence should be modified or reduced or whether he should be permitted to serve the remainder of his sentence under home confinement.[5]   While not an extraordinary and compelling reason in itself, Yager is correct that COVID-19 is not irrelevant to a court's analysis of a motion under § 3582 (c) (1) (A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1 (A) (ii) (I).

All of that said, however, Yager fails to demonstrate that that his health issues fall within any of the specified categories, or render him more at risk from COVID-19 than any other inmate. His motion enumerates the following health issues: hypertension, old myocardial infarction, aortic

---

[5] As this Court is well aware, its authority under 18 U.S.C. § 3285(c) (1) (A) extends only to a compassionate release determination and that any decision about whether Yager should be released to serve the remainder of his sentence under home confinement pursuant to the Attorney General's Directive authorizing expanded BOP discretion consistent with section 120003 of the CARES Act is wholly within the purview of the Bureau of Prisons ("BOP").

aneurysm without rupture, psoriasis, follicular disorder, spinal stenosis, muscle weakness, enlarged prostate, shoulder and upper arm injury, and unspecified abnormality of gait and mobility. To support his argument that his health issues rise to a level of extraordinary and compelling, Yager provides 43 pages of medical records generated through the Bureau of Prisons Health Services. See Def. Ex. B, Dkt. 2222-2. Nearly all of these records reflect Yager's complaints about, and treatment for, neuropathy-related gait and balance problems, which based on the medical records presented, appear to be the result of spinal stenosis.[6] A total of 33 pages of these records are notes leading up to and following his 2016 surgery, following the diagnosis of spinal stenosis, with some of the records questioning whether Yager was engaging in post-surgical malingering. See Def. Ex. B, Dkt. 2222-2, pp. 14-16. Several pages that reflect more recent medical contacts also address Yager's ambulation issues. Virtually none of the records reflect that he has a terminal illness or that other issues including hypertension, old myocardial infarction, aortic aneurysm without rupture, or mild obesity compromise his ability to care for himself in the prison setting or are serious medical problems of current concern. According to a March 2019 note, Yager is taking medication for blood pressure and cholesterol. There is no indication that those conditions are not under good control. Def. Ex. B, Dkt. 2222-2, p.6. The most recent record, a one page document dated 6/22/2020 again addresses his ambulatory issues. It reflects that Yager has been assigned a first floor cell with a lower bunk, various orthopedic appliances including a knee brace, a leg compression garment, resistive exercise bands, medical shoes, a pillow, a 4-wheel walker, a cane, and a dental appliance and that he is to be allowed 2 mattresses, early "chow hall" for lunch and dinner, and up to 30 minutes extra time on the exercise bike. *Id.* In summary, it appears that Yager's

---

[6] Yager claims that while an inmate, he was "poisoned" by Gadolinium (a dye used in imaging). The claim that was considered by a specialist in 2017, who opined that this was not an etiology for his neuropathy or even a possibility given his original presentation. See Def. Exhibit B, Dkt. 2222-2, pp. 24-27.

8

chronic medical problems, which are primarily orthopedic in nature are being addressed and appropriately controlled in the prison setting. It is also of some import, that although at the time of his case disposition in 2016, there was a suggestion by Yager that he suffered from congestive heart failure, this was not borne out by a physical examination at that time. Dkt. 2167. Nor is it a condition that is identified in the medical records that Yager now submits in support of this motion. The pre-sentencing physical did note that Yager then suffered from hypertension which was under good control and that at 5'11" and 265 lbs. he was considered obese. *Id.* Nothing in the records that Yager now submits reflects that his hypertension does not remain under good control, or that there are any current concerns about his weight. In sum, Yager has not demonstrated medical conditions that present extraordinary and compelling reasons to support compassionate release, nor do his records explain how the coronavirus pandemic elevates his risk of contracting COVID-19 beyond the risk to the average inmate.

Moreover, as the Court is well aware, since the advent of the pandemic, BOP has implemented extensive measures to protect its staff and inmates.[7] These measures have been successful at FCI Milan, where as of September 22, 2020, the facility reported no coronavirus-positive inmates within its 1600-inmate population and reported a single coronavirus-positive staff member. See BOP's COVID-19 coronavirus website (updated daily at 3:00 p.m.) at https://www.bop.gov/coronavirus (last visited 9/22/2020). Moreover, since the advent of the pandemic, Milan reports a total of only 90 inmate positive cases, with 87 inmates recovered and 3 inmate deaths. Clearly this institution has done a good job of implementing the protective procedures developed by BOP, since it has achieved an infection rate that is below that of the general population.

---

[7] BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Finally, to qualify for compassionate release under the factors set forth in the policy statement, the court must find not only that an inmate's health issues meet the requisite criteria, but also, that the inmate is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) and must also consider the 18 U.S.C. § 3553 factors. The 18 U.S.C. § 3142(g) criteria which address release and detention, mirror in part, the § 3553 sentencing factors. Here, Yager argues that he has been deemed "low risk" by the institution, availed himself of the institution's educational opportunities and had lived a "law abiding life," during the nearly 20 years he was a fugitive. Def. Br. 13, 14. Dkt. 2222. As an initial matter, it is hard to see how a person who is a fugitive from justice, living under assumed names in a foreign country is "law abiding." More importantly, in urging the court to conclude he is not a present danger, Yager ignores other relevant criteria including the nature of underlying offenses. As discussed in more detail in the section below, the racketeering offenses to which Yager pled guilty were crimes of violence, involving the use of firearms, explosives and destructive devices. The underlying predicate racketeering acts attributable to him include assault and murder. His were among the most serious crimes ever to be charged in this district.

In the final analysis, Yager has failed to establish that his health issues, alone or in combination with the coronavirus pandemic, constitute an "extraordinary and compelling reason" for a sentence reduction under § 3582(c) and that he now presents no danger to the safety of any other person or to the community. Accordingly, Yager's motion for release should be denied.

**B.    The § 3553 (A) Factors Weigh Against Yager's Release.**

Even if Yager's health concerns were to meet the health standards for compassionate release, this Court should still deny his motion. As the final step in the Court's compassionate release analysis, the Court must consider the "applicable" § 3553 factor's, which in this case, weigh

heavily against Yager's early release. Moreover, the Court's consideration of these factors is necessarily separate from the court's determination of whether the defendant actually poses a continued danger to society. A defendant may no longer be an actual danger, but still be ineligible for early release under 18 U.S.C. 3582(c) (1) (A) based on an application of the § 3553 factors. *See*, *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020)(defendant convicted of trafficking methamphetamine and sentenced as a career offender, suffering from terminal liver cancer and therefor no longer a danger to the community, denied compassionate release after court weighed sentencing factors); *see also, United States v. Webster*, __F. Supp. 3d___2020 WL 618828 at *7 (E.D. Va., Feb. 10, 2020) (defendant suffering from end stage colon and prostate cancer, denied compassionate release after court found reduction would not reflect seriousness of offense or just punishment).

The federal sentencing factors, set forth at 18 U.S.C. § 3553, include 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (4) the kind of sentences and sentencing ranges established for (A) the applicable category of offenses  committed by the applicable category of defendant set forth in the guidelines. 18 U.S.C § 3553.

The most compelling factors prohibitive of early release for Yager are the nature and circumstances of his offenses, his criminal history, and the need for his sentence to reflect the seriousness of the offenses, to promote respect for the law and to provide just punishment for the

offenses. As the Second Superseding Indictment, the Plea Agreement and the PSR in this case all reflect, Yager committed and directed the commission of extremely violent offenses while serving as an Outlaw Motorcycle Club president, or "boss", first as the boss of the Gary, Indiana Outlaw chapter, and then as the boss of the entire Outlaw White Region. The racketeering offenses to which he pled guilty are based on underlying predicates that include assault and murder and involve the use of firearms and explosives, all committed with the objective of maintaining Outlaw dominance, and driving the rival Hell's Angels and Angel affiliate clubs from Outlaw territory.

This Court is intimately familiar with the underlying facts of these offenses, having presided over the three-month trial of nine of Yager's 16 co-defendants,[8] and over a second, separate two-week trial of a tenth co-defendant.[9] The details of the offenses as they involved Yager are set forth in the defendant's PSR 8-25, ¶¶ 14-82, Dkt. 2179. In summary, those details are as follows: Randy "Mad" Yager was a chapter boss, and then a regional boss in the Outlaw Motorcycle Club (OMC) also known as the American Outlaw Association (AOA). The Outlaw club was a one percenter club (meaning the Outlaws claimed to be among the 1% of motorcycle riders who were not "law abiding citizens"). PSR 8, ¶15, 17, Dkt. 2179. The Outlaws had a strict leadership hierarchy and membership requirements. *Id.* As the White Region boss. Yager had authority over the Outlaw chapters located in the Midwest.[10] He had high a level of control, and answered only to the national boss, who at the time of these offenses was Harry "Taco" Bowman. PSR 8-9, ¶16-17, Dkt. 2179. Until the early 1990's, the Outlaws dominated or controlled the Midwest region, and smaller motorcycle clubs needed Outlaw permission to exist in order to be

---

[8] Kevin O'Neill, Carl Warneke, Raymond Morgan, Robert Kruppstadt, Richard Mroch, David Kadlec Randall Miller, and Leslie John Jensen. Dkt. 1525.
[9] Harvey Powers. Dkt. 1646.
[10] Those chapters were located in Chicago, and Joliet, Illinois, Gary, Indiana, Milwaukee, and Janesville, Wisconsin, for a time Indianapolis, Indiana and Peoria, Illinois, and eventually, LaCrosse, Wisconsin. The Janesville chapter was also known as the Stateline chapter.

12

free from Outlaw aggression. PSR 9, ¶19, Dkt. 2179. The Outlaws' primary rivals were the Hell's Angels, a club that until 1993, had no presence in Outlaw territory. PSR 9, ¶20, Dkt. 2179. Starting sometime in 1993 and continuing into 1994, with an eye to gaining a presence in the Midwest, the Hell's Angel's began to court the Hell's Henchmen, a smaller 1%er club that had chapters in Chicago, Rockford, and Calumet City, Illinois, and South Bend, Indiana. *Id*. This gave rise to a gang war, with Outlaw bosses and their members engaging in acts of violence against the Hell's Henchmen and other motorcycle clubs that were affiliated or friendly with the Hell's Angels. PSR 10, ¶20- 21, Dkt. 2179.  The violence was intended to intimidate the members of the Hell's Henchmen and the other clubs. *Id*.  At a national gathering of Outlaws clubs in Florida on New Year's eve 1993, national president Bowman declared that 1994 was going to be a more violent, "in your face" year across the Outlaw nation and that there would be no "fence sitting" by smaller clubs, who would be either for or against the Outlaws and would be treated accordingly. *Id*. This set the stage for the violence that followed. Thereafter, Yager and other regional and chapter bosses met regularly to discuss their increasing concerns and to plan their attacks. PSR 11 ¶ 22, Dkt. 2179. All but one of the eight racketeering acts to which Yager pled guilty, involved acts of violence against rival bikers in the Outlaw regions. The exception is Act 7, which is the murder of Donald Fogg, a member of Yager's chapter, who Yager and Bowman believed to be a government informant. PSR 10 ¶ 22, Dkt. 2179.

A summary of the eight racketeering acts to which Yager pled guilty is as follows

*Racketeering Act 1: Illiana Speedway Murder Conspiracy:*

 Outlaws from various chapters traveled to the Illiana Speedway in Schererville, Indiana to assault and/or kill members of the Invaders, a Hell's Angels friendly club. The goal was to prevent them from racing at an event known as "Summer Madness." PSR 11 ¶ 24-31, Dkt. 2179. The

13

Outlaw participation was organized by Yager, whose chapter clubhouse was located near the speedway. Some Outlaw members brought firearms and others understood that firearms would be available at the speedway. The Outlaws also brought two vans stocked with various weapons as well as smoke grenades and ballistic vests. At the speedway, Outlaw members were assigned to scout for rival bikers and report to Yager, who was communicating with them by walkie-talkie. By mid-afternoon, no rival bikers had appeared and the Outlaws left the speedway without having accomplished their objective.

*Racketeering Act 2: South Bend Hell's Henchmen Clubhouse Arson.*

Yager devised a plan to commit arson at the Hell's Henchmen's clubhouse in South Bend, Indiana, using a car and a cooler filled with a flammable liquid. PSR 12-14 ¶¶ 32-37, Dkt. 2179. Initially, Yager paid another Outlaw to supply a car, but after that car broke down on its way to South Bend, Yager directed one of his club members to steal one. He and others then outfitted the stolen car with the cooler, wedged an ax handle between the driver's seat and the accelerator, ignited the liquid in the cooler, and sent the burning, driverless car careening toward the Henchmen clubhouse. The car struck the clubhouse, but ultimately did little damage to the building. The stolen car was totally destroyed. Fortunately no one was in the clubhouse so there were no injuries.

*Racketeering Act 3: Lancaster Murder and Murder Conspiracy.*

Bosses and members of Outlaw clubs and their affiliate clubs from all of the Outlaw regions traveled from their home states to a suburb of Buffalo, New York. They planned to exercise force to help Buffalo Outlaw chapter boss, Walter Posniak, keep Hell's Angels from racing at the Lancaster Speedway. PSR 14, ¶¶ 38-46, Dkt. 2179. Yager traveled to New York with three of his chapter members and once there, assumed a leadership role. Twice, he addressed the assembled Outlaws, telling them that they were not to permit any Hell's Angels to enter a sports bar event at

14

a local hotel the night before the races, and that they were not to allow any Hell's Angels into the races the following day. On race day, Yager, gathered in the speedway parking lot along with 50-60 armed Outlaws and Outlaw affiliates. The men had guns, knives and mag flashlights and some were wearing bullet proof vests. When they saw a small group of Hell's Angels already inside the speedway, they rushed to get inside. Yager and Posniak were among those leading the pack. Inside the speedway, four patch wearing Hell's Angels greeted them with a "Hey brothers, what's up?" Posniak responded that the Outlaws were not their brothers and that they would not be racing that day. Yager, together with Outlaw members Donald Fogg and Harvey Powers, grabbed one of the men (later identified as Michael Quale), pulled him to the side and began to beat him. Other Outlaws attacked Quale's companions. Once the fighting started, gunfire erupted. A Hell's Angel with a gun in each hand advanced toward the brawl and Yager yelled, "Will someone shoot that f*****r!" Powers began shooting and there was additional gunfire from previously unseen Hell's Angels, then a stampede-like rush of Outlaws trying to get out of the speedway and back to their vehicles.  Fogg, who was running with a rolled up item carried like a football, yelled, "I got a patch, I got a patch!" The patch was the Hell's Angel vest that had been taken from Michael Quale, who had not only been beaten, but stabbed multiple times with at least two different knives. Quale died of those stab wounds. (DNA testing later determined that the patch contained numerous holes and Quale's blood.) The patch was recovered from beneath Fogg's seat in Yager's car when the car was stopped later that day in the town of Silver Creek, about an hour's drive west of the speedway. Both Fogg and Powers later boasted about stabbing Quale. Also killed at the Speedway that day was Posniak, who had been struck in the chest by a single bullet.

*Racketeering Acts 4, 5, and 6: Conspiracy to Commit Murder, Attempted Murder, and Arson.*

In the fall of 1994, the Outlaws began to use explosives in their war against rival bikers, something that had not been permitted when Peter "Grease" Rogers was the White Region boss. PSR 17-20, ¶¶ 47-59, Dkt. 2179. After Rogers was shot and injured while riding his motorcycle on a Chicago expressway, he maintained his anti-explosives position while recuperating in the hospital. Yager, however, disagreed. As acting regional boss, Yager traveled to Detroit to consult with and seek approval for the use of explosives from the national boss. Stateline chapter boss Kevin O'Neill and Chicago chapter boss Carl Warneke accompanied him. At their meeting, Bowman declared, "No one in the hospital or in jail runs anything in the club," and he authorized the men to exercise their own judgment about the use of explosives. After Yager had secured this approval the Outlaws began to use explosives to try to kill or injure members of the Hell's Henchmen. Their goal was to intimidate them and cause them to rethink the idea of "patching over" to become Hell's Angels. By late summer or early fall, the Outlaw bosses had obtained explosives and identified several targets. The targets included vehicles owned and driven by Rockford Hell's Henchmen members and a building that housed the Chicago Hell's Henchmen Clubhouse. The use of explosives on these targets are the basis for the charges in Racketeering Acts 4, 5, and 6.

*Racketeering Act 4: Roger Fiebrantz Truck Bomb.*

Roger Fiebrantz, was the president or boss of the Rockford Hell's Henchmen club. PSR 18, ¶¶ 52-53, Dkt. 2179. An explosive was constructed by a member of the Milwaukee Chapter, and planted on Fiebrantz's truck by Stateline members. The truck was parked in the driveway of his home in Rockford, Illinois. On the evening of October 12, 1994, when Fiebrantz started his truck and put it into gear, the explosive, which was wired into the tail lights, detonated. The

explosion ripped through the underside of the truck and into the passenger compartment, badly injuring Fiebrantz. He was hospitalized for months and it was more than a year before he could walk, even with the aid of crutches or a cane. He never regained full mobility in his legs. Outlaw members later joked that Fiebrantz was "half the man he used to be," and Stateline boss O'Neill opined that he would serve as a constant warning to the Hell's Henchmen.

*Racketeering Act 5. Michael Coyne Vehicle Bomb.*

Michael Coyne was the vice president of the Rockford Hell's Henchmen chapter. PSR 18-19. ¶¶ 54-55, Dkt. 2179. Again, an explosive was constructed by the Milwaukee Outlaws, and planted by Stateline members. They affixed it to Coyne's Chevy Blazer, which was parked on a concrete slab adjacent to his Rockford home. Coyne was apprehensive based recent attacks on Hell's Henchmen members, so he looked under his vehicle before trying to start it. When he saw a suspicious device with a wire extending from it, he contacted the local police. Bomb squad officers responded. During the render-safe procedure, the device accidentally detonated. Coyne's truck was damaged but no one was injured.

*Racketeering Act 6: Grand Avenue Henchmen Clubhouse Bomb.*

The Chicago Hell's Henchmen clubhouse was located on Grand Avenue, in Chicago, Illinois. PSR 19, ¶¶ 56-59, Dkt. 2179. Again, an explosive device was constructed by Milwaukee Outlaws. It was fitted into a stolen Ford Taurus and driven to Chicago by a Stateline Outlaw who was followed by Stateline boss, O'Neill in a rental van. The original plan to park the car at the Henchmen clubhouse was aborted when the driver of the Taurus saw a police car following him. In the later, revised, plan, Raymond Morgan, who had become the Gary chapter boss, replaced the Stateline driver. Morgan drove the Taurus to the Henchmen clubhouse, again followed by O'Neill in the rental van. Morgan parked the car on the sidewalk in front of the clubhouse and fled on foot

as the explosive detonated. A passing motorist saw a fireball. The blast cratered the sidewalk beneath the car. It tore the front door of the clubhouse from its hinges, and propelled it through the building where it tore a hole in the rear wall. The Taurus was totally destroyed. An arson investigator observed that the engine was the only remaining part of the car that could not be carried away by one person. No one was in the clubhouse, nor were any passersby injured, despite the fact that the explosive had been detonated at a busy time of day. The event received extensive local news coverage. Warneke recorded that coverage and gave the tapes to Yager to pass along to Bowman.

Despite the damage to the clubhouse, the Henchmen didn't abandon it or their plans to become Hell's Angels. In December 1994, the Henchmen patched over to become Hell's Angels. Later, the Outlaws made a second attempt to destroy the building with gasoline and a lit fuse thrown into the breached rear wall of the building. This second effort also failed to destroy the building but eventually the new Hell's Angels chapter did abandon it. Then Yager and the Outlaws in his region celebrated by posting an "Outlaws" sign over the door of the building and lining up their motorcycles for a celebratory group picture.

*Racketeering Act 7: The Donald Fogg Murder*

In January 1995, Yager directed the murder of Donald Fogg. PSR 20-21¶¶ 60-71, Dkt. 2179. Yager and Bowman believed that Fogg was a government informant. Bowman had discussed their suspicion at a meeting of regional bosses, telling the men that the White region had informant in its midst, and that the "snitch" was going to be killed and his murder made to look like the work of the Outlaws' enemies. On the night that Fogg was killed, Yager insisted that several Outlaws and their wives join Yager and his girlfriend at a restaurant and further insisted that they all have their picture taken together, thus creating an alibi for himself. Later that night, Yager told the men

that he believed that Fogg and his girlfriend were providing information to law enforcement, and that a Gary Outlaw member was going to kill Fogg that night. Fogg's body was found on an abandoned playground lying face down in the snow, with three gunshot wounds to the head, his arms folded underneath, and loaded .45 handgun in his pocket. A single set of footprints led from the passenger side of his truck to his body, and a set of tire prints indicated that a second vehicle had been present at the murder scene. All of the physical evidence supported the conclusion that Fogg had been caught unaware and killed by someone he knew and trusted. At Fogg's funeral, one of the regional bosses, who had been at the earlier meeting with Bowman, asked if Fogg had been the informant. Bowman responded that he was, but stated that they were now telling people that Fogg's girlfriend was involved in his death.

*Racketeering Act 8: Jack Castle murder.*

In March 1995, Jack Castle, a former Hell's Henchmen who had patched over with his club to become a Hell's Angel, was shot outside his workplace. He was sitting in his car drinking coffee and eating a donut before his morning shift when he was hit with a barrage of high powered rounds. He was killed instantly. This murder was committed in the course of the Outlaws' own efforts to beef up their presence in the Midwest after their unsuccessful efforts to keep out the Hell's Angels. PSR 23-25, ¶¶ 72-82, Dkt. 2179. In December 1994, after the Outlaws had failed to prevent the Hell's Henchmen from becoming Hell's Angels, the Outlaws focused on increasing their own ranks in order to maintain their war against the rival bikers. In furtherance of this objective, Warneke talked to Yager about the possibility of patching over two Outlaw friendly clubs known as the High Spirits[11] and the Wheelmen. Yager was in favor of the idea, but didn't think he had the authority to offer those clubs the opportunity to wear an Outlaw patch. Yager consulted with

---

[11] In paragraph 72 and 73, this club is erroneously called the High Riders, but are correctly identified as the High Spirits in the following paragraphs.

Bowman who came to Chicago to put together a proposal that would allow the two clubs to keep their clubhouses and officers while becoming Outlaw chapters. As part of the deal, the members of these two prospecting clubs were expected to join the Outlaws war on the Hell's Angels. Yager instructed these men to select targets, to do surveillance, and to do "whatever they had to do" to advance the Outlaws' war effort. Stateline and Chicago Outlaw members supervised and participated in the surveillance of two newly minted Hell's Angel members. One of the men they surveilled was Castle, known as 4x4 because of his size. Although two specific members of the prospecting clubs had been designated to kill the targets, the plans involved numerous others, including Chicago Outlaws who were helping with the surveillance, and Stateline boss O'Neill, who had provided the Stateline's "untraceable crash car" for putative assassins' use. Ultimately, Castle was killed, not by the members of the prospecting clubs, but by two Chicago Outlaws who grew impatient with the plan. Eventually, the two prospecting clubs did patch over to become new Chicago Outlaw chapters. After the Castle's murder, a souvenir newspaper clipping detailing his homicide was taped to the gun cabinet in Yager's Outlaw clubhouse.

In applying the § 3553 factors, it is impossible to overstate the seriousness of these offenses or of Yager's role in them. The offenses were committed as part of a violent a war waged by a criminal gang, with Yager acting as a high-level leader. The conduct of these men, who were acting with Yager and under his direction, endangered not only rival motorcycle gang members, but also the lives and safety of innocent citizens. These are precisely the kind of crimes that the RICO statutes were designed to address in order to hold responsible not just the foot soldiers of criminal organizations, but also those leaders who authorize, direct and reward this type of destruction and violence.

20

Also relevant to the § 3553 analysis is Yager's history and character. At the time that he committed these crimes he had already acquired a RICO conviction for offenses committed as an Outlaw member. In this earlier case, the predicates included 1) an arson wherein he burned down the home of a fellow Outlaw member's mother, with her consent, in order collect insurance money to hire an attorney to represent the member in a murder case; and 2) an assault wherein he beat a man in a bar with a coatrack while another person brandished a gun to prevent other patrons from intervening. As the result of this offense, which had also been the subject of a local charge, his victim suffered a crushed eye socket, broken nose, chipped jaw bone, fractured vertebrae, bruised ribs, numerous cuts and punctures, and internal bleeding. PSR, 34-35, ¶¶ 151-153, Dkt. 2179. Moreover, Yager was barely out of prison, and still on parole for these offenses when he immersed himself into the Outlaw war. *Id*.

Additionally, while Yager touts his "law abiding life" during his years on the run in Mexico, and claims to be a changed man from the one who committed these crimes so many years ago, wholly absent from the record in this case is any self-reflection or expression of regret or apology for these crimes.

Finally, it is of some import that Yager has already received substantial consideration in this case. The PSR author calculated, and the Court found at sentencing, that his offense level for these crimes totaled 43, and his criminal offense score totaled VI. The resulting guideline imprisonment range is life. PSR 42, ¶ 190, Dkt, 2179. Co-defendants similarly situated to Yager received life sentences. Yager, however, was sentenced to just 180 months (15 years) pursuant to the plea agreement in which the both government and the Court gave substantial consideration to his claim of serious health issues. To reduce his sentence further would unduly depreciate theses offenses and Yager's role in them.

In the final analysis, based on the very serious nature of these offenses and the defendant's criminal history, there is a strong need to promote respect for the law, to deter others from engaging in such mindless aggression and brutality, and to provide just punishment. Accordingly, the Court should find that the § 3553 factors weigh against early release.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's compassionate release motion.

Dated September 22, 2020 at Milwaukee, Wisconsin.

Respectfully submitted,

MATTHEW D. KRUEGER
United States Attorney

By:

*s/Carol L. Kraft*
CAROL L. KRAFT, WSB # 1000117
Assistant United States Attorney
517 East Wisconsin Avenue, #530
Milwaukee, WI 53202
Telephone: 414 297-1706
Fax: 414 297-1738
Email: carol.kraft@usdoj.gov

23